ANNA K. COWDRICK, GENERAL ADMINISTRATRIX OF THE ESTATE OF ALTON A. COWDRICK, DECEASED, PLAINTIFF-APPELLANT, v. PENNSYLVANIA RAILROAD COMPANY, A BODY CORPORATE, DEFENDANT-RESPONDENT.

Submitted May 26, 1944—Decided September 14, 1944.

For the plaintiff-appellant, *Edward W. Haines*.

For the defendant-respondent, *John A. Hartpence* and *James R. Laird, Jr.*

The opinion of the court was delivered by

CASE, J. The appeal is by plaintiff from a judgment of nonsuit entered in the Supreme Court following the presentation of her case before a jury at the Ocean Circuit.

Decedent was employed by the Pennsylvania Railroad Company to tend the drawbridge and trestle over Barnegat Bay between Ocean Gate and Seaside Park. On the night of January 5th, 1943, he had a six o'clock supper at home. Shortly after ten o'clock he started for night duty, taking a lunch with him. He was not seen alive after that time. It is evident that he reached his destination and entered upon his work because, among other incidents, there was a record, kept under company orders and signed by him, noting that he had raised the signal at eleven o'clock. The raising of the signal was part of an operation which consisted of closing the draw so that trains could pass and of raising the signal to inform engineers of approaching trains that the bridge was ready for railroad traffic. No further performance of duty by Cowdrick was proved. The record. according to rules, should show bridge movements and boat movements.

There was no other entry that night, and so far as appears no boats sought or were refused passage. Cowdrick's absence was discovered the following day. His body was found beneath the trestle under the surface of the water, caught between two pilings near the concrete abutment which served as a base for timbers supporting the trestle and the bridge-tender's shanty. The body was clothed in an overcoat which was buttoned, a pair of canvas gloves, and other ordinary clothing, including stockings, except that it was without hat or shoes. One of Cowdrick's shoes, dry but showing a stain from oil or grease on the sole as well as marks of scraping, was lodged on a part of the bridge timbering above the concrete and about in a line, vertically, with the point where the shanty platform ends and the trestle continues. An autopsy disclosed that death was caused by a fractured skull and consequent injury to the frontal lobe of the brain, with inhalation of water into the lungs as a contributing factor. There was no lighting fixture at the shanty. However, Cowdrick had held the job for twelve years, was thoroughly familiar with the surroundings and had a lantern which was found in the water near the body. His lunch, wrapped and uneaten, and the accompanying thermos bottle of coffee, untouched, were found in the shanty. There was evidence tending to prove that the fatality had occurred sometime during the night.

The shanty was a small one room structure adjacent to and on a level with the stringpiece of the trestle and connected therewith by a platform. On the drawbridge was a device which operated a train signal located about five hundred feet to the west and beyond the shanty. The operation was by a long rod formed by coupling one inch pipes, end to end, reaching from the machine to the signal. The movement of the rod forward eight inches set the signal one way, and the pulling of it back for the same distance set the signal in reverse. The rod paralleled the tracks at the outer edge of the ties and was held in place by occasional small contrivances, called "carriers," fastened to the trestle. The carriers were in effect metal rings with small interior revolving rollers upon which the rod moved. Appellant's brief

asserts that the rod was oiled, but that is not the testimony. The carriers or their rollers were sometimes oiled, as were the other moving parts of the bridge. The rod, supported by two or three carriers, passed over the shanty platform parallel with, and a few inches from, the stringpiece. At each end of the platform was a railing, the top rail of which as it left the shanty was parallel with the platform but at a distance of several feet from the shanty slanted sharply to meet the platform level at the location of the signal rod. At the westerly end of the platform and some inches below the level thereof were two insulated wires, one of which was found pulled loose from its insulator, in a location about a foot or two above a bridge timber on the end of which there was a "scraping" mark.

The suit was brought by the decedent's widow under the Federal Employers' Liability Act, title 45, chapter 2, sections 51, et seq., of the U. S. Code; therefore plaintiff was under the duty of proving that the death was due to the negligence of the defendant company. The trial court held that there was proof to warrant a finding that the decedent arrived at the bridge sometime during the night of January 5th, 1943; that after he arrived there he had a fall from either the trestle or the platform down to the substructure and that he met death from a fractured skull, but that there was no proof as to how the decedent fell or as to the cause of his fall or as to whether he fell from the trestle or the platform; that a finding of negligence would necessarily involve a degree of speculation which the proofs did not justify and that consequently the plaintiff should be nonsuited.

The substance of appellant's argument on proof of negligence runs in this wise: The wire, disconnected from its glass insulator, the mark of scraping on the beam-end, the shoe found at a lower level, the body with injured head, and the lantern near-by sustained a deduction that Cowdrick fell in that approximate location; and, thus far, the argument is sound. But from this point the argument rests on conjecture rather than on proof or permissible inferences. The absence of a fixed light is condemned; but Cowdrick, admittedly, was familiar with the surroundings and he had his lantern

as is evidenced by the fact that the lantern went into the water with him; and no incident is proved from which to sustain the inference that the absence of light was a cause, either proximate or remote. Again, it is suggested that because the sole of Cowdrick's shoe showed a stain of oil or grease he had slipped on the rod or pipe made oily by the carrier; and this involves a whole chain of circumstances, which are presumed to be facts but not proved—that the stain was freshly made that night, that the piping was either oily or greasy, that the stain came from the pipe and not from some other source—all of which are conjectured to support the suggested inference.

Because the action is under the federal statute, it is subject to federal rather than to state rules of law. *Chesapeake and Ohio Railroad Co. v. Kuhn,* 284 *U. S.* 44; 76 *L. Ed.* 157. Appellant accordingly cites several recent decisions of the United States Supreme Court and would have them accorded a degree of pertinency which we think is not justified by our issues or our facts.

The first case so cited is *Tiller* v. *Atlantic Coast Line Railroad Co.,* 318 *U. S.* 54; 63 *S. Ct.* 444; 87 *L. Ed.* 610. It deals chiefly with the doctrine of assumption of risk which is not an element in the instant appeal. It further holds that where the facts are in dispute and the evidence in relation to them is that from which fair-minded men may draw different inferences the question of negligence is for the jury. Clearly the inference which fair-minded men may draw in order to present a jury question must be such as carries a reasonable and causal relation between the negligence and the accident. We think that the facts of the present case do not reasonably support such inferences and that the facts of the cited case do not set a precedent pertinent to our problem. In that case plaintiff's decedent was a railroad policeman who was at the time of the accident performing the duty of inspecting, with the aid of a flashlight, seals on a slowly moving train, at night, in the switch yard between two sets of tracks which allowed three feet seven and one-half inches of standing space when trains were moving on both sides. He was hit and killed by the rear car of a train backing in

the opposite direction on the next track. The rear car of the backing train was unlighted, although a brakeman with a lantern was riding on the side away from Tiller. The bell was ringing on the engine, but both trains were moving and the Circuit Court found that it was probable that Tiller did not hear cars approaching from behind him. No special warning was given. The actual happening, with the causal incidents, were in proof.

The second of the cases, *Bailey* v. *Central Vermont Railway, Inc.,* 319 *U. S.* 350; 87 *L. Ed.* 1444, is said by appellant to be directly in point. We think that it is not. Bailey was a section man working with a crew in the unloading of track material. The instructions were to unload a car filled with cinders. The car was placed on a bridge so that the cinders could be dumped directly through the ties to the road eighteen feet below. The only available footing was about twelve inches wide, partly occupied by a raised stringer, and was without railing at the side of the car. The car was a hopper, opened from the side by a man turning a nut with the aid of a wrench. The mechanism was such that when the hopper started to open the shaft would spin, spinning the wrench with it, wherefore the operator must needs disengage the wrench or let go of it lest he be thrown off balance or knocked down. Although Bailey was warned not to let the wrench catch him, he was unskilled and perhaps unfamiliar with the mechanism. He took the wrench and pushed on it but the hopper did not open. He pushed it again, the hopper opened, the nut spun and Bailey was thrown by the wrench to the road below. He died from the fall. There were other practical ways of dumping the cinders to the roadbed.

So as to a third cited decision, *Tennant* v. *Peoria and Pekin Union Railway Co.,* 88 *L. Ed.* 322, Tennant was employed by the defendant railroad company as a switchman in its yards. The evidence supported a fact finding that Tennant was killed by being run over by one of defendant's trains at a point where it was within his duty to be; that the engineer who operated the train had seen him, before the train motion began, in a position with respect to the engine

that was consistent with the performance by him of his duty in that respect and in that place; that the company rule required the ringing of a bell before such a train movement for the benefit of the members of the crew; and that the bell was not rung.

It is, perhaps, enough to say in addition, by way of distinguishing the present case from those cases, that while there are facts in proof from which it may be inferred that Cowdrick's death was caused by a fall from a point at or near the corner of the shanty platform with a continuation of the trestle, there is nothing to connect that fall with any of the various incidents of which appellant complains—improper lighting, inadequate guard rail, signal rod superimposed on the platform, rollers or carriers which were occasionally oiled, lack of sufficient warning of danger, or the "exposed, windswept and dangerous" condition of the drawbridge. In each of the cited cases it was in actual proof that the deceased had met his death by reason of a moving mechanism that was the property of the defendant and that was set in motion and operated by the defendant or under its orders, and in each case there was in proof an act or omission for which the defendant was clearly responsible which had a proximate relation to the death and which a fact-finding body could reasonably say was negligent—the absence of warning of an impending train movement in two of the cases and the failure to put the workman on notice as to the perilous nature of his task and to give him adequate instructions in the other case. It is still the federal rule, as restated recently in the Tennant case, *supra,* that the plaintiff in an action under the Federal Employers' Liability Act is required to present probative facts from which the negligence and the causal relation may reasonably be inferred, and that mere speculation is not allowed to do duty for probative facts.

The only presumptions of fact which the law recognizes are immediate inferences from the facts proved. Negligence is a fact which must be shown. For plaintiff to succeed it was necessary for her to show, not only a wrongful act or omission on the part of the defendant, but in addition the existence of such circumstances as would justify the inference

that her husband's death was caused thereby. *McCombe* v. *Public Service Railway Co.,* 95 *N. J. L.* 187; *Price* v. *New York Central Railroad Co.,* 92 *Id.* 429.

"Proof of negligence alone does not entitle the plaintiff to recover under the Federal Employers' Liability Act. The negligence complained of must be the cause of the injury. The jury may not be permitted to speculate as to its cause, and the case must be withdrawn from its consideration unless there is evidence from which the inference may reasonably be drawn that the injury suffered was caused by the negligent act of the employer." *Atchison, Topeka and Santa Fe Railway Co.* v. *Toops,* 281 *U. S.* 351; 74 *L. Ed.* 896.

For the reasons given we think that the trial court did not err in granting the nonsuit.

Appellant also complains of certain rulings on evidence all of which turn upon her unsuccessful effort to have a witness, who was permitted to testify as an expert, give his opinion about the comparison of the scratches or marks on the sole of the decedent's shoe with certain roughnesses on the surface of the pipe or rod which, as described above, was a part of the signal mechanism and was laid along the surface of the shanty platform. The witness was a shop foreman employed by the Standard Oil Company and had done some work, apparently as a sideline or avocation, in balistics in the sense of studying comparative markings on bullets and the like. Five months or more after Cowdrick's death the witness examined the shoe and also the conditions at or near the shanty with a view to ascertaining what might have caused the marks on the shoe. He found some roughnesses on the surface of the pipe. The examiner asked the witness how the marks on the shoe had been produced. The question was overruled on the stated grounds that the preliminary proofs were quite too uncertain, and that adequate groundwork had not been laid. There were numerous questions, the objective being to have the witness express an opinion that the marks on the shoe had been caused by the roughness on the pipe; and all such were overruled, upon essentially the same grounds.

The questions were overruled because the witness had not,

in the opinion of the court, reduced his theory to a practicality—had not resolved his deductions from the fanciful and the conjectural into reality. It is also clear to us, from the court's rulings and remarks, that while the court conceived the witness was justified as an expert, within limitations, in some matters of comparison, he had not qualified himself to testify in answer to the specific questions he was being asked. Whether a witness is to be considered an expert in regard to any question of science or skill must, from the nature of the case, be left very much to the discretion of the trial judge, and his decision is conclusive unless clearly shown to be erroneous in matter of law. *New Jersey Zinc Co.* v. *Lehigh Zinc Co.*, 59 *N. J. L.* 189, 194. We think that that legal element, without going further, is sufficient to sustain the rulings. The witness had testified that he had made photographs of the sole of the shoe and then enlarged the photographs; that he had examined the piping but not that he had photographed it; that he had made marks from the pipe by sliding a piece of paper, backed with carbon, over the suspected location; that a model of an impression might be produced in plaster of paris or plasticine. But none of these objects were produced in court. The section of pipe, or in lieu thereof a moulded replica of the portion which was the subject of the witness's study, was not produced.

It was the witness' theory that the marks on decedent's shoe had been made, not by a simple impression of another object indenting, under pressure, the sole of the shoe so that the shoe would show, in reverse, the projections on the face of another object, but that the marks on the shoe were produced by scraping, or sliding under pressure, along the surface of another object. The conjectural aspect of such testimony is accentuated by the fact that the witness named that other object as a round pipe one inch in diameter running lengthwise along the platform. A pipe of such shape and dimension must, of necessity, present a very limited surface for contact with an unyielding substance such as the sole of a man's shoe; and testimony regarding the use of paper in lieu of a shoe for demonstration is scarcely convincing. Appellant seeks to correlate the offered testimony with the

proof of fingerprints, as in *State* v. *Connors,* 87 *N. J. L.* 419,
and *State* v. *Cerciello,* 86 *Id.* 309; with certain testimony
about a ladder in *State* v. *Hauptmann,* 115 *Id.* 412; with a
comparison of bloody hand marks on a wall with the hand
marks of a defendant as in *State* v. *Miller,* 71 *Id.* 527, or
with the comparison of footprints as in *Johnson* v. *State,*
59 *Id.* 271; *Id.* 535. In the Cerciello case there was, or
there was opportunity for, a comparison in court of the
exhibits by fingerprint experts—"Their testimony, as well as
its subject-matter, involving the introduction in the case of
the alleged fingerprints of the defendant, for the purpose
of comparing them with the fingerprints upon the hatchet,
presents a subject for judicial consideration  *  *  *" (page
313). In the Connors case (see page 420) a facsimile
impression of the alleged fingerprints upon a certain post was
introduced for comparison with an actual impression of the
defendant's fingerprints. Fingerprints of an individual are
generally regarded as exclusively personal to him without
duplication in the prints of any other person. In the Haupt-
mann case we fail to find authority for the full argument of
counsel based thereon; but it does appear that an officer
testified that a ladder was found near the Lindbergh home,
that when the ladder was set "in the mudholes" the two ladder
marks on the house were "right" with the ladder, that the
marks on the house were plain scraping marks in the white
paint, and that there were white marks on the top of the
ladder. The objection appears not to have involved the status
of an expert but was upon the point that the statement that
the marks were "ladder marks" was a conclusion. This court
assumed that there was a technical impropriety on the part
of the witness in designating the marks as "ladder marks"
but held that as the ladder was in evidence the jury were in
a position to form their own conclusion from it and from
the other testimony. In State *v.* Miller there was an imprint
of a bloody hand on a certain wall alleged to be the mark of
defendant's hand; the defendant was asked to place his hand
on the bloody mark which he did, and there was testimony
concerning the comparison. The section of the wall contain-
ing the print was produced before the jury. The Johnson

case is not in point; the testimony therein was by non-expert witnesses regarding footprints in the earth near the body of a murdered woman. "Such testimony involved in no sense the knowledge of an expert" (59 *N. J. L.,* at *p.* 543).

It was within the discretion of the trial court to hold that the witness had not developed the proofs to the point that he had shown himself qualified to, or that he should be permitted to, answer the propounded questions. In the examination of experts much must be left to the discretion of the trial court. *Cushing* v. *Josses (Mass.),* 197 *N. E. Rep.* 466. We do not determine whether or not the subject-matter of the examination was properly within the scope of expert testimony; that could hardly be determined without a more detailed examination than the transcript discloses.

The judgment under review will be affirmed.

*For affirmance*—THE CHANCELLOR, CHIEF JUSTICE, PARKER, CASE, BODINE, DONGES, HEHER, PERSKIE, PORTER, COLIE, DEAR, RAFFERTY, HAGUE, THOMPSON, DILL, JJ. 15.

*For reversal*—None.