11 N.J. Super. 144 (1950)
78 A.2d 129
FRANKLIN A. SEWARD AND HELEN SEWARD, HIS WIFE, PLAINTIFFS-APPELLANTS,
v.
NATURAL GAS COMPANY OF NEW JERSEY, A CORPORATION OF NEW JERSEY, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued December 11, 1950.
Decided December 28, 1950.
*147 Before Judges McGEEHAN, JAYNE and WM. J. BRENNAN, JR.
Mr. William J. O'Hagen argued the cause for appellants (Messrs. Stout & O'Hagen, attorneys).
Mr. Samuel A. Larner argued the cause for respondent (Mr. Wilbur A. Stevens, attorney).
The opinion of the court was delivered by WILLIAM J. BRENNAN, JR., J.A.D.
Plaintiffs appeal from a judgment in favor of defendant entered in the Law Division, Monmouth County, upon a jury verdict of no cause for action.
The suit sought damages for Mrs. Seward, and consequentially for Dr. Seward, for personal injuries suffered by Mrs. Seward in a gas explosion in the cellar of their Shark River Hills summer home.
Dr. Seward on May 6, 1939, entered into a written contract with defendant for the installation of the latter's "system" for the supply and service of liquefied petroleum gas (propane gas) and at the same time purchased from defendant a kitchen gas range and a side-arm heater. The "system" consisted of a cylinder or gas storage tank equipped with a regulator or reducing valve and placed on a concrete platform on the outside and at the back of the house and of copper tubing running from the storage tank to the range and heater.
The contract required Dr. Seward to purchase his requirements of liquefied petroleum gas exclusively from defendant for a period of three years, and this he did to the date of the explosion. Defendant reserved title to the gas storage tank and related equipment and the right to remove the same "in whole or in part at any time without previous notice."
Defendant's employees installed the copper tubing which connected the gas storage tank with the range in the kitchen and the side-arm heater in the cellar. The heater and the hot water tank were located in the far corner of the cellar. The connection to the heater was made by running the copper tubing from the gas storage tank through the house foundation *148 wall along the underflooring of the house and thence down to the heater.
The complaint charges negligence in very general terms. The pretrial order is not printed in the appendix (see Rule 3:16, as amended, and Rule 1:3-1), and we do not know whether any limitation or clarification of the issues was set forth therein. The allegations of the complaint are that the explosion resulted from the escape of propane gas caused by the negligence of defendant (1) in furnishing improper equipment and appliances, (2) in making an improper installation, and (3) in furnishing an unsafe and hazardous gas.
The explosion occurred on July 15, 1941. Mrs. Seward went to the cellar and lighted the heater after manually turning on the petcock on the heater to start the flow of gas from the storage tank. She returned upstairs and waited about 15 minutes for the water to heat. She turned on the water and it ran hot for 15 or 20 minutes and then suddenly ran cold. She went down to the cellar and discovered there was no flame in the burner and that the gas was flowing. She stopped the gas flow by turning off the petcock. This was 30 or 40 minutes after she had first lighted the burner. There was no evidence why the flame went out nor for how long it had been out and the gas flowing. Mrs. Seward returned upstairs and two hours later went back to the cellar.
She descended the stairway to the bottom step. She detected no odor of any kind. She said she did not know the gas was propane gas and "I had never been told that that gas was heavier than air or anything like that and much slower in dissipating." She lighted a match while standing on the bottom step "thinking if it flickered I wouldn't attempt to light the heater." The lighted match did not flicker. She then went over to the heater, stooped down before the door of the heater, lighted another match, "There was an immediate explosion." The force of the explosion was great. Mrs. Seward was seriously burned; the whole house shifted at least a half-inch on the foundation; a bedroom floor was blown upwards, doors on the first floor were blown off and there was much miscellaneous damage.
*149 The defendant's witnesses testified the gas supplied by it contained an odorant called ethyl mercaptan so that its presence upon escape could be readily detected. The trial court submitted to the jury the question whether this odorant was in fact present in the light of Mrs. Seward's testimony that she had detected no odor. The court, however, refused plaintiffs' request to charge based on defendant's alleged negligence in furnishing improper equipment and in making an improper installation. Plaintiffs contend the rulings in these respects and related rulings on offers of evidence were erroneous.

IMPROPER EQUIPMENT AND APPLIANCES.
Defendant admitted in an answer to an interrogatory propounded by plaintiffs that the regulator or reducing valve attached to the storage tank outside the house was made of "metal and rubber." Plaintiffs' counsel attempted to elicit testimony of an expert chemist that propane gas has an effect on such materials which would cause a malfunction of a valve made of them. The trial court sustained defendant's objections to these questions. This was not error. The evidence was there are many kinds of regulator or reducing valves, and there was no proof which type was installed on this equipment or of the condition of the particular valve before or at the time of the explosion. The storage tank and the valve had been removed by unidentified persons on the day of, or the day after, the explosion.
The trial court, moreover, did not err in refusing plaintiffs' request to charge based on the doctrine of res ipsa loquitur. Plaintiffs' contention was the proofs showed title to and control of the valve were reserved by defendant, that the valve somehow became defective, shutting off the flow of gas to the burner and causing the flame to go out, that it somehow became sufficiently adjusted to cause the gas flow to resume and escape through the unlighted burner. While there were proofs of defendant's ownership and control of the regulator valve, it is pure speculation, in the absence of proofs of its type or condition, that the valve was not functioning *150 properly and that this alleged defect was "in all probability the direct cause" of the explosion. Cf. Menth v. Breeze Corporation, Inc., 4 N.J. 428 (1950), at pp. 436, 437; Kramer v. R.M. Hollingshead Corporation, 5 N.J. 386 (1950).
The trial court also sustained defendant's objections to questions asked plaintiffs' expert chemist designed to elicit from the witness testimony that the gas line to the burner should have been equipped with an automatic shut-off to stop the flow of gas from the tank to the burner when the flame went out. The court ruled the proofs did not show the witness was qualified to testify whether or not there was a standard or practice followed in 1939 and 1941 to equip the lines with automatic shut-offs. The expert had a wide experience and knowledge as a chemist and a long familiarity with propane gas. He had no experience, however, in the installation of propane gas equipment for residential use. We are satisfied the trial court properly exercised its discretion in the circumstances. Cowdrick v. Pennsylvania R.R. Co., 132 N.J.L. 131, 141 (E. & A. 1944).
The defendant's proofs showed there was no automatic shut-off in the line. There was, therefore, no prejudicial error in sustaining objections to questions asked the expert chemist whether he found one in the line when he examined it and the heater shortly before the trial.

IMPROPER INSTALLATION.
Plaintiffs' first and second requests to charge had for their purpose submitting to the jury the question whether under the proofs defendant had exercised the proper degree of care in installing its "system" in the manner it did to connect with the side-arm heater in the cellar. We think the proofs fully supported these requests and that it was error to refuse to charge them.
The cellar is of peculiar construction. The house rests on a foundation 2 1/2 feet high from grade with side dimensions approximately 28 feet by 30 feet. The bare ground is the area beneath the house except that directly under the house *151 center is a concrete-lined "pit" 4 feet deep and about 10 1/2 feet square. The "pit" is the cellar with walls only 4 feet high but with a clearance from its floor to the house underbeams of 6 1/2 feet, the 4 feet depth of the "pit" plus the 2 1/2 feet clearance above the "pit" top at ground level to the house underbeams. The space beneath the house thus takes the shape of a hollow block 28 feet by 30 feet and 2 1/2 feet deep centered above the smaller "pit" 10 1/2 feet square and 4 feet deep. Entrance to the "pit" is by a stairway down from the first floor. The only openings in the foundation walls are two windows, one in the east wall and the other in the south wall, so placed that, according to the testimony, the cross ventilation between them did not pass over the "pit."
There was proof this peculiar construction created a condition in which the propane gas, because it is heavier than air, would upon escape sink to the bottom of the pit and remain there some time out of reach of air circulation to dissipate it. Plaintiffs' expert testified:
"Q. How would it be dissipated? A. In this particular installation principally by diffusion.
"Q. By diffusion? A. Right.
"Q. And by diffusion you mean various air currents that come down and pick it up and waft it around before it goes? A. No, sir. That is convection.
"Q. Will you give me your definition then of diffusion that you have in mind? A. Diffusion is a state in which two dissimilar fluids in contact, by means of their molecular activity, permeate each other. The process is slow.

* * * * * * *
"A. Well, if a lighter fluid be resting upon a heavier fluid; namely, if air be resting upon propane gas, there will be a gradual working upward of the particles of propane and a gradual working downwards of the particles, the molecules of air, until during a period possibly of a day there might be a uniform mixture. How long is difficult to estimate. I would say at least a day, unless there be a current of air which would accelerate that mixing and passing off, but there is a gradual working of one fluid into another even though a lighter one be resting upon a heavier one; they will still mingle in time."
"A. There is no sensible ventilation to dissipate it in a pit regardless of the proximity of windows.
"Q. What is that for? Why is that? A. Because the gas is 60 per cent heavier than air, falls down to the bottom of the pit, and is not subject to flowing out through the windows six feet higher.

*152 "The Court: Suppose there are drafts through the house having windows on one side and windows on the other. Would that dissipate the propane in this cellar?
"The Witness: The line of draft in this particular building, sir, did not come within five or six feet of the pit. If you were to connect those two windows to a straight line, that straight line would miss this pit by five or six feet, and hence the air currents would not even flow over the top of the pit, let alone dig and dissipate the gas out of the pit."
The employees of the defendant who installed the "system" admitted that at the time he made the connection he was aware of the nature of construction of the cellar and that the heater was "quite a ways removed from the windows," that he knew the gas was heavier than air, that he did not apply or install a vent or connection to a chimney, although the heater had a flue-hole for that purpose, that there was no automatic device installed in the line to shut off the flow of gas from the tank to the burner if the burner light went out and that the only method of turning off the gas was by manual operation of the petcock on the side of the heater.
Propane gas takes a gaseous form at normal temperatures and is kept in liquid form at such temperatures by application of pressure. In its pure form it is colorless, and odorless. An odor is supplied by the introduction of a mercaptan, usually ethyl. One of the properties of the gas, already mentioned and of significant importance in the circumstances of this case, is that it is "about a little over one and a half times as heavy as air" so that, according to plaintiffs' expert chemist, "it will sink" "if the gas comes into the presence of air into a room, both being at the same temperature."
Defendant's vice-president admitted that combination of this gas with air in certain proportions produces an explosive mixture. The results of the explosion in this case are evidence of its destructive power. Other courts commenting upon this gas on proofs supporting their observations have said,  "Propane gas is a dangerous substance," March v. Carbide & Carbon Chemicals Corporation, 265 App. Div. 1064, 39 N.Y.S.2d 493 (App. Div. 1943), "may cause an explosion more powerful than dynamite," Grinnell v. Carbide *153 & Carbon Chemicals Corporation, 282 Mich. 509, 276 N.W. 535 (Sup. Ct. Mich. 1937).
The vice-president also admitted familiarity with a standard appearing in an instruction of the National Board of Fire Underwriters in a booklet dated in 1948 reading, "When in the gaseous state these gases present a hazard comparable to any flammable natural or manufactured gas except that being heavier than air ventilation requires added precaution;" he disclaimed knowledge, however, whether this instruction was in effect in 1941.
Defendant was bound to exercise a reasonable degree of care commensurate with the dangerous and explosive nature of its commodity. Thornton, Law of Oil and Gas (4th ed. 1925), vol. 1, p. 1392. Care and diligence should always vary according to the exigency which requires vigilance and attention, conforming in amount and degree to the particular circumstance under which they are to be exercised, but the care must be equal to the occasion on which it is to be used, and is always to be judged of according to the subject matter, the force and danger of the material under the defendant's charge in the circumstances of the case. Beck v. Monmouth Lumber Co., 137 N.J.L. 268 (E. & A. 1947). Gas "is certainly, in some circumstances and under certain conditions, an extraordinarily dangerous element," Anderson v. Atlantic City Gas Co., 7 N.J. Misc. 297 (Sup. Ct. 1929); "and the rule of ordinary care with respect to its transmission is adjusted, in view of its known dangers and probable entailment, by a standard of care proportionate to the probable dangers." Ibid., p. 298.
The circumstances and conditions of this case in view of the known tendency of this gas upon escaping to sink and the apparent danger in this "pit" that such escaping gas would not be readily dissipated called upon defendant to exercise that degree of care "which comprehends a circumspection, a foresight, a prevision, which has due and proper regard to reasonably probable contingencies," Adams v. Atlantic City Electric Co., 120 N.J.L. 357, 363 (E. & A. 1938); Beck *154 v. Monmouth Lumber Co., supra; Kress v. City of Newark, 9 N.J. Super. 70 (App. Div. 1950).
Ordinary experience teaches that the flame in a gas burner will go out, often for causes difficult or impossible to establish. This was a reasonably probable contingency which defendant should reasonably be expected to have anticipated. The proof was the defendant's gas, being heavier than air and thus having a tendency to sink, presented a definite danger in this peculiarly constructed cellar with the greater difficulty of a slow dissipation because accomplished, according to the expert testimony, by diffusion rather than by convection of air currents, since the windows were so placed that "the air current would not even flow over the top of the pit let alone dig and dissipate the gas out of the pit." Whether under these circumstances defendant took proper precautions in making the side-arm heater connection and fulfilled its duty of care is a question about which reasonable men might well differ, and it therefore became an issue to be decided by the jury.
The case of Beck v. Monmouth Lumber Co., supra, presented a closely analogous situation. There a power company erected a pole on the property of a lumber company and strung uninsulated wires carrying high voltage to furnish current for the lumber company's electric motors. The lumber company used a mobile crane in its business with a 65-foot boom for raising lumber and machinery and unloading freight cars. The electric wires were strung 29 to 33 feet above the ground. Plaintiff's decedent was killed while repairing the crane when it came into contact with the electric wires. There was a jury verdict against the power company and the lumber company and both defendants appealed. The power company relied principally on its argument that there was no proof of negligence on its part because the uncontradicted proofs established the wires were installed with standard equipment and maintained in accordance with standard practices. The Court of Errors and Appeals rejected this argument, holding (at p. 273), "As a general rule the adoption and operation of a method which accords with that in general use by well *155 regulated companies and approved by experience is due performance of the duty and the care owed, but the care which must be exercised over the construction and maintenance of a highly destructive agency requires more than the use of mere mechanical skill and approved mechanical appliances; it also includes circumspection and foresight with regard to reasonably probable contingencies. * * * The crane, mobile in its nature, was used on the property for various purposes. Its presence and use were known to the power company representative supervising and making the electrical installation. Its dangerous proximity to wires they knew to be uninsulated was apparent. One of the defendant's expert witnesses admitted the existence of uninsulated, highly charged wires created a hazard and were installed in this instance with no consideration to the use of the crane." "Admittedly no warning of danger was given." "Notwithstanding the employment of standard equipment and standard practices, the jury could reasonably find this defendant had failed to exercise the degree of care required under the circumstances."
So here the special property of this gas to have a tendency to sink because heavier than air was known or should have been known to defendant; "admittedly no warning of danger was given." The peculiar construction of the "pit" and the location of the side-arm burner with relation to the windows in the foundation of the house were known to the installation mechanic employed by the defendant. "It was incumbent upon defendant to take into account the vital factor of the room's air circulation" when introducing this highly dangerous gas. Jaeger v. Elizabethtown Consolidated Gas Co., 124 N.J.L. 420 (Sup. Ct. 1940). A jury could reasonably find this defendant had failed to exercise the degree of care required under the circumstances.
In Jones v. Blossman, 209 La. 530, 25 So.2d 85 (Sup. Ct. La. 1946), plaintiff purchased a butane water heater which was set up and installed by defendant. Sometime thereafter plaintiff remodeled his house and constructed therein a small closet, and defendant installed the heater in that closet. Defendant instructed plaintiff to leave the door of the closet *156 open. Adjacent to that closet was a clothes closet. On the occasion in question plaintiff went to the clothes closet in order to open the door of which it was necessary to close the door to the closet containing the water heater, and this she did. She remained in the clothes closet for about ten minutes and immediately thereafter closed the door to the clothes closet and opened the door to the closet containing the water heater. As soon as she did this an explosion occurred in the closet containing the water heater. Plaintiff alleged as negligence the installation of the water heater in this small closet without any outlets or openings other than a vent running from the heater to the outside of the house. Judgment for the plaintiff was affirmed, the court saying, "When the defendant installed this gas heater he was installing a dangerous instrumentality and he is, by law, charged with knowledge of the particular dangers characteristic to such an instrumentality and is particularly charged with the duties to use that degree of care which is commensurate with the danger."
In Grinnell v. Carbide & Carbon Chemicals Corporation, supra, defendant through a sales agent installed a Pyrofax system which included two supply tanks of propane gas. The gas escaped from one of the tanks because the tank was laid on its side in the locker. The gas being heavier than air seeped through the holes in the bottom of the locker into the engine room of the boat and the explosion resulted. It was held the finding of negligence below was fully supported by the proofs.
In Cleveland Gas Co. v. Woolen, 30 Tenn. App. 282, 205 S.W.2d 754 (Ct. of App. Tenn. E. Sec. 1947), the gas company supplied butane gas to 2,500 customers. The company had knowledge that plaintiff used a water heater not equipped with an automatic shut-off and that she was the only customer served by defendant who had a heater of that type. The flow of gas to all the customers was interrupted by some mechanical difficulty at the central production point. The flame in plaintiff's burner went out. When the mechanical difficulty was repaired and the flow of gas resumed it escaped *157 through the unlighted burner, accumulated in plaintiff's basement and ultimately exploded. A judgment for plaintiff was affirmed.
The court said, "We think the evidence in this case, due to its peculiarities, which probably will never be duplicated, makes it a case of negligence so strong as to verge on a heedless indifference to consequences. Certainly, the defendant did not use that high degree of care commensurate with danger that may reasonably be expected to occur from the improper or negligent distribution of this most useful  and dangerous  servant of mankind."
In Fry v. Sears, Roebuck & Co., 271 Mich. 469, 260 N.W. 906 (Sup. Mich. 1935), plaintiffs had a jury verdict against the seller of a hot water heater resulting from the explosion of the heater caused by freezing of water in an expansion tank placed by the seller in an attic. The negligence claimed was that the tank, which was installed almost three years before, should not have been placed in the attic where the water was more likely to freeze than in the room. The judgment was affirmed. The court said, "The obligation of defendant was to furnish a system which would not only keep running, but which would start safely under ordinary use. It was bound to anticipate that the fire would be out in warm weather, would be started when it got cold, and that people determine the time for a fire from the conditions about them. If, then, defendant put the tank in a place where the water was more likely to freeze than would be indicated by conditions surrounding plaintiff, knowing or having reason to anticipate danger therefrom, it would be guilty of negligence."
See also Clay v. Butane Gas Corporation, 151 Neb. 876, 39 N.W.2d 813 (Sup. Ct. Neb. 1949); Atlanta Gas Light Co. v. Johnson, 76 Ga. App. 413, 46 S.E.2d 191 (Ct. App. Ga. 1948); Annotation, 138 A.L.R. 870.
We conclude it was for the jury to say whether defendant fulfilled its duty of care in the light of the particular circumstances, irrespective of the absence of proofs whether the connection of the heater accorded with standard practices generally. Beck v. Monmouth Lumber Co., supra.
*158 The questions of contributory negligence and assumption of risk were on this record properly submitted to the jury for determination. Thornton, supra, p. 1470; Beck v. Monmouth Lumber Co., supra.
Reversed.