Joe E. GRISSOM, Plaintiff-Respondent,

v.

Nettie M. HANDLEY, d/b/a Handley's Tri-County Gas and Fertilizer Company, Hayti, Mo., Defendant-Appellant.

No. 8483.

Springfield Court of Appeals.

Missouri.

Dec. 16, 1966.

John R. Fowlkes, Caruthersville, Harold D. Jones, Bock & Jones, New Madrid, for defendant-appellant.

Wendell W. Crow, James F. Ford, Ford, Ford & Crow, Kennett, for plaintiff-respondent.

TITUS, Judge.

An explosion of fire which injured plaintiff in a bean field on November 13, 1962, near Hayti, Pemiscot County, Missouri, provoked this lawsuit and a $15,000 verdict and judgment in his favor. On appeal the defendant, a retailer of propane (a liquid petroleum gas), successfully convinced all judges here plaintiff had not made a submissible case in the trial court. A difference existed, however, as to whether the cause should be reversed outright or reversed and remanded. Defendant's motion for rehearing was granted, the parties have offered their supplemental briefs and arguments, and the matter is now assigned to the present writer for belaboring. From the subsequently appearing pronouncements set forth in brackets, the reader will realize a liberal kidnapping has been taken of the original opinion in this case provided by Hogan, J.

Two contrivances are involved. One is an auto-combine used to harvest soybeans and which had been converted to use propane, instead of gasoline, as fuel. The other is a 500 gallon propane tank of customary appearance. The tank and its fixtures were owned and supplied by defendant, and the propane in the tank was put there by defendant. The tank was mounted on a four-wheeled trailer owned by Troy Grissom, so it could be hauled about to service the combine which was the property of Bondy Grissom. Although the term "customary appearance" is applied to the tank, it is necessary to undertake a detailed description of this item, its attachments, and the trailer.

The tank was cylindrical in shape with either end encased by a dome-like closing. Affixed to the trailer with its axis horizontal, the tank was about eight feet long with a diametrical span approximating two and one-half feet. The trailer was equipped

with a tongue of pipe, the end of which appears capable of coupling with a trailer hitch. When the casualty occurred, the tank and trailer were parked in a turnrow at the south end of the bean field with the tongue extending towards the east. Consequently, the tongue end of the trailer is alternately referred to as the front or east end of the tank.

A bird's-eye look at the tank (i. e., looking down at it from above, reading it maplike with the tongue to the east) reveals that directly atop the tank and a short distance west of center is affixed a percentage gauge. Facing upward, the percentage gauge (said to bear numbers up to 95 or 100) indicates the amount of liquid in the tank. This gauge was not introduced into evidence.

At what appears to be the middle of the tank lengthwise (east and west) and just north of the lengthwise center line, was an input fitting used to fill the 500 gallon tank (Plaintiff's Exhibit Number 26). Part of this fitting was an outage or 85 per cent pressure gauge operated by thumbscrew. Extending to the west horizontally from the fitting was a pressure gauge, the dial of which faces upward and bears numbers from 0 to 300. The dial reading reveals the pounds of pressure per square inch inside the tank.

Just east of the lengthwise middle of the tank and slightly south of the lengthwise centerline was the filler fitting (Plaintiff's Exhibit Number 29) and excess flow check valve. To this was attached a filler hose or tube (Plaintiff's Exhibit Number 30) used in transferring propane from the 500 gallon trailer mounted tank to the fuel tank on the combine. At the end of the hose was the filler valve (Plaintiff's Exhibit Number 28) to be connected to the combine tank when it was being serviced from the larger tank.

The pressure relief valve (Plaintiff's Exhibit Number 27) was located on top of the tank and about two feet east of the filler fitting. This valve, as it appears from the exterior of the tank, is one and three-fourths inches in diameter and one and one-half inches high.

[The storage tank in question had been filled several days earlier at the defendant's plant and had been left in the field where plaintiff and another combine operator were working. "Around one o'clock" plaintiff stopped his combine near the storage tank in order (so he says) to check the oil, and it was then that the casualty occurred, though the evidence is sharply in conflict as to what actually happened. Plaintiff's theory was that gas escaped from a relief valve on the storage tank; when it came in contact with the engine on the combine, which was "red hot," it caught fire or exploded. A deposition which plaintiff offered in evidence showed that six days following the accident plaintiff had told a physician that the combine caught fire and he climbed up on it in an attempt to put the fire out, and at that time the combine exploded, burning the plaintiff. The defendant produced a witness who claimed to have been present and who testified that the plaintiff caused the accident himself by using the compressed gas (through a filler tube) to blow the accumulated dust and debris from the radiator on the combine. In any event, there was a fire or explosion; the plaintiff was severely burned and either fell or was thrown from the combine. The defendant has appealed solely upon the issues involving liability. The extent and seriousness of the plaintiff's injuries are not questioned.

 In his amended petition, the plaintiff pleaded numerous assignments of negligence, as well as breach of warranty on the defendant's part, but he finally submitted his case upon three specific grounds. These were: (1) defendant's failure to warn plaintiff of the possible escape of gas from the storage tank; (2) defendant's negligence in filling the tank with an excessive amount of gas; and (3) defendant's failure to have the relief valve vented upward so as to prevent escaping gas from

coming in contact with nearby machinery. In this court, the defendant contends that its motion for directed verdict made at the close of all the evidence should have been sustained. We are therefore called upon the determine whether plaintiff made a submissible case upon the issues actually submitted, granting plaintiff the most favorable view of all the evidence, and giving him the benefit of all reasonable inferences to be drawn therefrom. Thaller v. Skinner & Kennedy Co., Mo., 315 S.W.2d 124, 126–127(1) (2); Guthrie v. City of St. Charles, 347 Mo. 1175, 1184, 152 S.W.2d 91, 95(5); Newcombe v. Farmer, Mo.App., 360 S.W. 2d 272, 276(2).

As to defendant's negligence in failing to warn plaintiff "of the possible release of combustible gas," the appellant contends that there was no showing of any necessity for such a warning and therefore no basis for submitting a failure to warn as being negligence. The respondent's argument justifying this submission is diffuse and somewhat difficult to follow. Citing Thompson v. Economy Hydro Gas Co., 363 Mo. 1115, 257 S.W.2d 669, he stresses the combustible nature of liquefied petroleum gas and the defendant's duty to exercise a degree of care commensurate with the product, and says that the release of gas from the relief valve constituted a "danger within the foreseeable, expected and intended use of the tank," of which plaintiff should have been warned. There were, of course, certain risks ordinarily attendant upon the use of the tank, for the escape of small amounts of vapor normally accompanied the process of refueling farm machinery. Plaintiff testified, however, that he was familiar with this risk, and his evidence indicated that he appreciated the danger involved in releasing the compressed gas near possible sources of ignition. It was not the general risk of danger of which he says he should have been warned; rather, he maintains the possibility that gas might be released through the operation of the relief valve, in the circumstances here presented, constituted a hidden danger within the foreseeable, expected and intended use of the tank, a latent danger of which he should have been warned.]

The relief valve on the tank was [designed to release gas and relieve the internal pressure when it exceeded 250 pounds per square inch. Normally, the record indicates, the relief valve releases gas only when a tank has been overfilled, or possibly when it has been filled near the limit of its safe capacity (about eighty per cent of its water gallon capacity) and is exposed to high outside temperatures. The expansion characteristics of the gas are not shown. A Mr. Dunivant, defendant's manager, testified that if a tank were overfilled, in "say 90 or 95 degree weather," the relief valve would probably release, and the vapor, if released, would probably be explosive. Mr. Dunivant could recall only one time, in his three and one-half to four years' experience with L.P. gas, when a relief valve had released gas from a tank; his testimony was that he "* * * seen it on one occasion, I believe." Mr. Clifford James, who had fifteen or twenty years' experience servicing liquefied petroleum gas equipment, stated he had "occasionally" seen gas spew from relief valves because of "too much pressure." A Mr. Grady testified that on one occasion he had seen a defective valve release gas at less than 250 pounds per square inch. There is no evidence more precise than that which we have just recited which indicates when and upon what occasions a relief valve may be expected to function and release gas. The "high" temperature obtaining when this casualty occurred, and which the plaintiff argues is a favor to be considered in the case, was 62 degrees, with a north breeze blowing.

In our view, the evidence did not warrant submission of defendant's failure to warn of the "possible release of combustible gas." We are aware that the defendant's duty in that respect depended upon the foreseeability of the risk of harm, and that the question of foreseeability is essentially a subjective one. But we cannot

subscribe, in the first place, to the view that plaintiff's use of the tank in close proximity to "red hot" machinery was within its contemplated, intended use, as he maintains, since it was necessary to release some vapor "* * * in order to get gas * * * from the main tank into the little tank on the combine * * *." Rather, in view of the fact that the combustible nature of liquefied petroleum gas is a matter of common knowledge, Thompson v. Economy Hydro Gas. Co., supra, 363 Mo. at. 1124, 257 S.W.2d at 673–674; Seward v. Natural Gas Co. of New Jersey, 11 N.J.Super. 144, 78 A.2d 129, 134 (5, 6), we would be more inclined to say it was a use not reasonably to be foreseen. Assuming we cannot say that as a matter of law, however, defendant's liability still must be predicated upon "* * * some probability of harm sufficiently serious that ordinary men would take precautions to avoid it," Bean v. Ross Manufacturing Co., Mo., 344 S.W.2d 18, 25; La Plant v. E. I. DuPont De Nemours and Co., Mo.App., 346 S.W.2d 231, 241 (12), and though the defendant's duty is not wholly dependent upon the balance of probabilities, the risk of harm must have been a reasonably foreseeable one. Apprehension of any likelihood of injury in this case presupposes negligent filling of the tank and use of the tank when danger would be apparent to any reasonable man, and in our judgment would require defendant to anticipate a contingency beyond the bounds of reasonable foreseeability. Upon the record presented, the defendant had no duty to warn plaintiff against such a contingency, and its failure to do so would not therefore constitute negligence.

Considering now plaintiff's further submission that the defendant negligently filled the tank beyond a safe level, we find that all of his direct evidence of overfilling came from Bondy Grissom, his uncle and partner in the combining operation. Plaintiff established that the tank should be filled to eighty or eighty-five per cent of capacity, and that any filling beyond that would be improper in the circumstances obtaining here, though it might not be excessive in very cold weather.]

[Bondy testified that "six or eight days" before the accident he left the tank with the defendant to be refilled. The tank then "had some in it," but Bondy didn't know how much and didn't look at it. When he picked the tank up, he spoke to no one at the defendant's plant, but before taking the tank away he looked "at the *guage* on top of the tank" and "it showed the percentage about between ninety-five and a hundred, and close to a hundred." Bondy then attached the tank and trailer upon which it was mounted to his pick-up and took it to the field where plaintiff and one George Flowers were combining soybeans. He drove directly to the field, a distance of about four miles, first down a blacktop road, then over a gravel road, across a rather steep railroad crossing and then into the field. Bondy said he had been using this tank or one like it for two or three years.

On cross-examination, having testified that he had looked at the percentage gauge, Bondy was shown the exhibit with the *pressure* gauge attached, and the following colloquy ensued:

"Q. You say you looked at this tank that morning before you hooked onto it and pulled off?

A. Yes, sir.

Q. Is this the *guage* that you looked at and to read the pressure you were telling the jury about?

A. I am not sure. It is—is there another one? Let me see.

Q. I have handed you what has been marked as Plaintiff's Exhibit 26.

A. Yes, sir.

Q. That is the *guage* you read?

A. Yes, sir.

Q. And it said somewhere between ninety-five and a hundred percent?

A. That's right."

The only other direct evidence about the amount of gas which had been put in the tank came from a Mr. Grady, defendant's witness, who testified that he had filled the tank to eighty per cent of its capacity by putting 175.2 gallons of propane in it eleven days before the accident. Mr. Grady corroborated his testimony with a delivery ticket.

Thus, we have a situation in which there was no testimony showing the amount of gas in the tank before it was filled by the defendant, no evidence of the amount left after the fire or explosion, and only the very equivocal testimony of one witness as to the amount which was in the tank a short time before the fire or explosion occurred. It is true, as the plaintiff argues, that the pressure gauge and the percentage gauge were both on top of the tank and rather close together, but Bondy testified that he had been using this kind of tank for two or three years and that he had checked the tank before leaving defendant's plant by looking at the percentage gauge. Yet, having seen pictures of the tank, and being shown a different gauge, he testified in effect that he had looked at the pressure gauge rather than at the percentage gauge.

■ We think we must agree with the defendant that Bondy's testimony does not amount to substantial evidence that the storage tank was negligently overfilled. His testimony simply leaves one to speculate which gauge he checked and to surmise or guess whether the figure he saw on the graduated gauge was 95 or between 95 and 100 per cent of capacity, or 95 to 100 pounds per square inch upon the nearby pressure gauge, or whether he had forgotten at trial time what he had looked at. So far as direct evidence of overfilling is concerned, we agree with defendant that plaintiff's proof comes within the rule stated in Adels-

berger v. Sheehy, 332 Mo. 954, 961, 59 S.W. 2d 644, 647 (6, 7), and reiterated in such cases as Stephens v. Thompson, Mo., 293 S.W.2d 392, 394 (1, 2), and Corder v. Pruitt, Mo., 361 S.W.2d 659, 661, that when a party relies on the testimony of a single witness to prove a given issue, and his testimony is so contradictory and conflicting that it tends both to prove and disprove the issue, and the inconsistency of his testimony is not explained by other evidence, no case is made.

■ Of course, as plaintiff maintains, he is entitled to the most favorable view of all the evidence in determining whether a submissible case was made, Christie v. Gas Service Co., Mo., 347 S.W. 2d 135, 137 (1); Stephens v. Kansas City Gas Co., 354 Mo. 835, 845, 191 S.W.2d 601, 604 (6), and negligence, like any other substantive fact, may be established by circumstantial as well as by direct evidence. However, " * * * the circumstances so established must give rise to an inference of negligence which reasonably follows * * *," Williams v. Cavender, Mo., 378 S.W.2d 537, 541 (2–4), and it is not enough that they may be merely consistent with such an inference, or that they may give equal support to inconsistent and contradictory conclusions. Bowers v. Columbia Terminals Co., Mo.App., 213 S.W.2d 663, 670 (8). Submissibility of the plaintiff's case depended upon some substantial evidence that the defendant company put too much gas in the tank, and though we may concede the defendant's duty not to fill it beyond a safe level, Tri-County Gas & Appliance Co. v. Charton, 229 Ark. 989, 320 S.W.2d 103; Harvey v. Zell, 87 Ga.App. 280, 73 S.E.2d 605; Martin v. Farmers Cooperative Exchange, Okl., 368 P.2d 1012, the basic question remains whether, upon the whole record, the proven circumstances point with reasonable certainty to the conclusion that it did so.

One of the basic assumptions of plaintiff's argument in this court is that the tank must have been excessively filled be-

cause gas escaped into the atmosphere through a pressure relief valve located near one end of the tank. Plaintiff's evidence concerning the source of the escaping gas is so vague and ambiguous, however, that it has no real tendency to establish the place from which it came. Bondy, who observed the accident from 100 or 150 yards, as a "guess," described the accident as follows:

"Q. * * * just tell the jury what you observed then?

A. I seen one of the combiners pulled in beside this white tank, this L.P. Tank, and setting beside the L.P. Tank, and when I later noticed and made my turn, and of course, as I was coming in and approaching, why, I seen a fog or mist coming up from this tank.

Q. What end did that come from?

A. When it got off there, it seemed to be coming out of the east end * * *.

Q. Describe what happened to this white mist?

A. The best I could tell it was a fog coming up and spreading, and then, of course, as I was coming on in I noticed a flame and fire it looked like, and then I seen Joe standing, and drawed my attention to the combiner, and I seen Joe standing on the back end of the combiner at that time.

Q. Then where was the fire first?

A. On the combiner.

Q. And that was after the white mist came over?

A. Yes, sir.

Q. And then what happened to the fire?

A. It kind of cut out my view there at that time and I couldn't see anything but a fog and a blaze."]

Plaintiff possesses little knowledge of the matter. George Flowers, plaintiff's other eye witness, was operating a combine in the bean field some two hundred feet away from the site of the casualty with the tank and trailer between him and the combine which plaintiff was using. Flowers testified, "I looked over and towards the combine * * and I seen a white mist spray up in the air approximately twenty feet and I looked back down [to check my combine] and when I looked back there was nothing but fire around the engine of the combine." He said the fire did not stay at the engine but came (or moved) to the tank. "Q. Which end of the tank was it coming out? A. It would be the east end. Q. Anything located on the east end of the tank? A. A hose was tied up to the front of the trailer on the east end. Q. A hose was tied up there? A. Yes, sir. Q. Was that the filler hose? A. Yes, sir." Upon being shown photographs of the tank, Mr. Flowers identified and marked the filler valve as the source of the escaping gas. Concerning the tank he testified, "There's a group of valves on there but I don't know exactly what they are * * *" Subsequently, after being shown plaintiff's Exhibit 27 by plaintiff's counsel and having been advised it was the relief valve, Mr. Flowers told plaintiff's counsel "It [the fire] was coming out *near* there."

[Much of his (plaintiff's) argument is based upon the assumption that Bondy Grissom's testimony constitutes substantial evidence of the defendant's negligence, but, as we have said, we cannot agree. Nor would it serve any useful purpose to discuss and distinguish the cases cited by plaintiff in support of his argument; it is enough to say that this is not a case comparable to Braun v. Roux Distributing Co., Mo., 312 S.W.2d 758, which depended upon the force and credibility of expert testimony, nor to Williams v. Ricklemann, Mo., 292 S.W.2d 276, which essentially involved a choice between conflicting estimates of speed and distance. We are aware that the probative

value of a witness' testimony is ordinarily a matter for the trier of fact, but in the final analysis the question whether evidence on a given issue is substantial is one of law for the court, Probst v. Seyer, Mo., 353 S.W.2d 798, 802(3); Tharp v. Monsees, Mo., 327 S.W.2d 889, 899(12); Vietmeier v. Voss, Mo., 246 S.W.2d 785, 787–788(3), and upon consideration of all the evidence bearing on the issue of negligent overfilling, we conclude the plaintiff made no submissible case in that respect.

 What we have just said largely disposes of the defendant's contention that no submissible case was made upon the plaintiff's third assignment—that defendant was negligent in not venting the relief valve upward so as to prevent escaping gas from coming in contact with possible sources of ignition. For the purposes of this opinion, we need not construe the regulation [1] quoted by the plaintiff nor describe whether, if it was applicable, the defendant was under a duty to modify the relief valve which it purchased and installed. Submissibility on this final ground, we think, was contingent upon a showing that gas escaped from the relief valve; and, since we have the opinion that there was no substantial evidence showing where the escaping gas originated, we consider that this final ground of submission was likewise without substantial basis in the evidence. We may add, however, that there seems to be little causal connection between the point of escape of gas and the casualty, in this particular case. It has been judicially noticed that propane is heavier than air and tends to sink, or seek the lowest level, Skelly Oil Co. v. Holloway, 8 Cir., 171 F.2d 670, 676; Gable v. Tennessee Liquefied Gas Co., 45 Tenn.App. 674, 325 S.W.2d 657, 665 (2), and the evidence generally here was that the cloud or "puff" of gas was caught by the wind and blown toward the hot manifold. Assuming for the moment that violation of this regulation would at least be evidence of negligence, Sections 323.020, 323.040, RSMo (1959), V.A.M.S.; 38 Am. Jur. Negligence, Section 170, p. 845; and see Ward v. City National Bank & Trust Co. of Kansas City, Mo., 379 S.W.2d 614, 619 (6), violation thereof would not constitute actionable negligence unless it was a proximate cause of the casualty. Downing v. Dixon, Mo., 313 S.W.2d 644, 650(4); Bauman v. Conrad, Mo.App., 342 S.W.2d 284, 287(3). Venting the relief valve further upward would not have prevented the casualty in this case, and we are unable to agree that defendant's violation of this regulation, if such it was, amounted to causal negligence upon the record presented.

Upon consideration of the whole record, we conclude there was a failure of proof to support the assignments of negligence submitted, and that the motion for directed verdict made at the close of all the evidence should have been sustained. The judgment must therefore be reversed.]

When defendant's motion for rehearing was granted, the particular attention of the parties was pointed at the concern regarding remand and plaintiff was invited to render specific comments on what evidence, if any, the record revealed he might make a submissible case upon retrial. Total absence of a pertinent response, either by brief or argument, serves only to burden the court with an unassisted task and attests the fact attorneys have not changed since receiving the rebuke, "Woe unto also, ye lawyers! for ye lade men with burdens grievous to be borne, and ye yourselves touch not the burden with one of your fingers." Luke 11:46.

---

1. [Promulgated by the Motor Fuel Tax Unit of the Department of Revenue, pursuant to Chapter 323, RSMo (1959), V.A.M.S. The regulation provided, in a material part, that " * * * [t]he discharge outlet from safety relief devices shall be located on the outside of enclosed spaces and as far as practicable from possible sources of ignition, and vented upward in such a manner as to prevent impingement of escaping gas upon containers or parts of vehicles or on vehicles in adjacent line of traffic * * *."]

Preparation of a catalogue raisonne on remand cases seems an unattainable undertaking and any degree of success thereat would surely go unappreciated as a certain arena of vagueness appears required in which to exercise judicial discretion and tie the ends of justice. In remand cases, however, it is reasonably certain the appellate judicial spoon that ladles sauce on plaintiff's goose seldom, if ever, sops the defendant's gander, for "if a plaintiff obtained a judgment without error, the defendant could not have it reversed and remanded on the theory that he might make a better defense on retrial." Owings v. White, Mo. (banc), 391 S.W.2d 195, 197; Nussbaum v. Kansas City Stock Yards Co. of Maine, Mo., 359 S.W.2d 335, 342(8).

Different from the present situation is a general class of cases where all the facts are fully presented to the jury on the pleaded charges of liability and plaintiff abandons some of those charges upon submission for strategic advantage. The abandoned assignments of liability under those circumstances become moot and an appellate court is not obliged to comb the record to determine if defendant's motion for directed verdict was properly overruled because of the existence or availability of evidence sufficient to sustain a discarded theory. Under most such conditions, if the submitted charge is not supported by the evidence the case will be reversed without remand. Smith v. St. Louis Public Service Co., 364 Mo. 104 (banc), 259 S.W.2d 692, 696(3); Guthrie v. City of St. Charles, 347 Mo. 1175 (banc), 152 S.W.2d 91, 95(4); Quinn v. St. Louis Public Service Co., Mo., 318 S.W.2d 316, 323(16); Farmer v. Taylor, Mo.App., 301 S.W.2d 429, 434–435(9, 10); Batson v. Ormsbee, Mo.App., 304 S.W.2d 680, 684–685(8).

However, if the situation is the same as in the first category, supra, except that plaintiff's failure to submit on all assignments of liability is due to a "misadventure" (as opposed to a selection for strategic advantage) and the evidence discloses the plaintiff might recover on another theory, it is said the case will be remanded on reversal. For example: Snyder v. Jensen, Mo., 281 S.W.2d 819, 824–825(6) where a misadventure occurred because "counsel apparently believed that there was enough evidence adduced" to support the submitted theory or "may have believed," mistakenly, that two separate specifications of primary negligence were submitted in the conjunctive. A "misadventure" was said to have existed in Reece v. Reed, Mo., 326 S.W.2d 67, 72(7, 8) when the plaintiff, struck from the rear by defendant's car while stopped for a red traffic signal, destroyed a prima facie case by reading defendant's deposition to the jury wherein defendant attributed the accident to an unanticipated "blackout." It was opined plaintiff might recover on retrial if defendant's deposition was not again read into evidence. In Lamont v. Thompson, Mo., 303 S.W.2d 589, 595(6–8) a "misadventure" resulted because plaintiff overlooked or failed "to appreciate the significance of the evidence tending to support the [abandoned] issue." for cases of "misadventure" wherein plaintiff's misconceived application of humanitarian negligence or res ipsa loquitur, and abandoned or did not plead primary or specific negligence, see Homfeld v. Wilcoxon, Mo., 304 S.W.2d 806, 811(6, 7), Blaser v. Coleman, 358 Mo. 157 (banc), 213 S.W.2d 420, 423(8–10); McClanahan v. St. Louis Public Service Co., 363 Mo. 500 (banc), 251 S.W.2d 704, 709(7); Cudney v. Midcontinent Airlines, 363 Mo. 922 (banc), 254 S.W.2d 662, 667(9).

Perhaps a third broad segment of remand cases and those attaining a similar result by affirming the trial court's order granting plaintiff a new trial, are those where the particular theory upon which plaintiff might recover upon retrial (as disclosed by the evidence) is not pursued at the first trial, is not pleaded, or is abandoned

before trial. Karch v. Stewart, Mo., 315 S.W.2d 131, 137–138(7); Haferkamp v. City of Rock Hill, Mo., 316 S.W.2d 620, 628–629 (7); Simpson v. Kansas City Connecting Railroad Co., Mo. (banc), 312 S.W.2d 113, 121(5, 6). It apparently matters not when the new theory dawns, for in Pigg v. Bridges, Mo. (banc), 352 S.W.2d 28, 34(10), the hypothesis defendants might be liable as joint adventurers, rather than as principal and agent, first saw the light of day and was first suggested to the court en banc after a division of the Supreme Court was unable to agree.

■■■■ We are loath to foster an opportunity for witnesses to state with certainty on retrial what they obviously did not know at the first hearing. Nevertheless, we need heed the authorities cited which indicate this is a case for remand. No authority requires us to be more explicit than we have been, or, as many cases have done, to lead plaintiff by the hand to and through the second trial of the cause. As plaintiff has failed to touch the burden cast upon us with one of his fingers, we rightfully decline to raise one of ours to direct his way.

■■■■ No quarrel was made with the amount of the verdict nor with any proceeding or instruction relating to plaintiff's damages. " * * * [N]o new trial shall be ordered as to issues in which no error appears." V.A.M.R. 83.13(c); V.A.M.S. § 512.160, subd. 3. The new trial of this case should be limited to the issue of liability, and if upon retrial the verdict be for the plaintiff, the trial court shall enter judgment for him in the sum of $15,000 against the defendant.[2]

The judgment is reversed and the cause remanded for a new trial on the issue of liability only.

STONE, P. J., and HOGAN, J., concur.

2. Flournoy v. Kuhn, Mo.App., 378 S.W.2d 264, 268(8); Stafford v. Fred Wolferman, Inc., Mo., 307 S.W.2d 468, 478(14); Tucker v. Taksel, Mo.App., 345 S.W.2d 385, 389(6); Hoffman v. Kroger Company, Mo.App., 340 S.W.2d 152, 155(7); Beckwith v. Standard Oil Co., Mo., 281 S.W.2d 852, 857(11).