66 N.J. Super. 77 (1961)
168 A.2d 423
GEORGE ANGEL, AN INFANT, BY HIS GUARDIAN AD LITEM, BELLE ANGEL, AND BELLE ANGEL, INDIVIDUALLY, PLAINTIFFS-APPELLANTS,
v.
RAND EXPRESS LINES, INC., DOMINICK DAVANZO AND ALLEN TABACK, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued January 23, 1961.
Decided February 21, 1961.
*80 Before Judges CONFORD, FREUND and KILKENNY.
Mr. Samuel A. Larner argued the cause for plaintiffs-appellants (Messrs. Budd, Larner & Kent, attorneys).
Mr. Charles A. Rooney argued the cause for defendants-respondents Rand Express Freight Lines, Inc. and Dominick Davanzo (Mrs. Marian V. Rooney-Sheehy, on the brief).
Mr. John T. Mooney argued the cause for defendant-respondent Allen Taback (Messrs. Hein, Smith & Mooney, attorneys).
The opinion of the court was delivered by FREUND, J.A.D.
Plaintiff George Angel, an infant, by his guardian ad litem, instituted suit in the Law Division, Bergen County, for personal injuries sustained while a passenger in an automobile operated by the defendant Taback. The accident occurred on March 5, 1958, when the Taback vehicle collided with a tractor-trailer owned by the defendant Rand Express Freight Lines, Inc., and operated by its employee, Davanzo.
As a result of the collision Angel, then 19 years of age, was thrown from the motor vehicle onto the highway and rendered unconscious. He was taken to the Presbyterian *81 Medical Center, where examination and X-rays disclosed a laceration of the right frontal area of the scalp and a linear fracture of the skull to the left of the midline, approximately 4 1/2 inches in length. He remained in a drowsy and semi-conscious condition until ten days after his admission, and was not discharged from the hospital until March 22, 1958. During his stay at the institution he consistently suffered from severe headaches, ranging from the right frontal area of his head to the left parietal area, and in addition experienced blurring of vision. Six days after his discharge and return to his home in Oceanside, N.Y., he was admitted to the Doctors Hospital in Freeport, N.Y. New X-rays were taken and further examinations were conducted of the patient, still complaining of headaches, dizziness and nausea; an additional diagnosis was made of contusion of the left kidney, cerebral concussion, and edema of the brain. He was discharged from Doctors Hospital on April 10, 1958, but continued, up to the time of trial, to complain of headaches and blurring and duplicity of vision. X-rays were taken about a month prior to trial, disclosing the previous diagnosis, lineal fracture of the left occipital bone, as well as a fracture of the inner table of the left parietal area.
The trial before a jury resulted in a verdict of $6,000 in favor of young Angel and $2,500 in favor of his mother Belle Angel, suing per quod. Plaintiffs thereupon moved for a new trial on the issue of damages, stressing that the verdict was grossly inadequate and therefore the product of mistake, partiality, passion and prejudice; the asserted inadequacy was also attributed to allegedly erroneous rulings by the trial court in the exclusion of certain of plaintiffs' proofs. The instant appeal is from the order denying that motion and from final judgment entered in accordance with the jury's verdict; it involves solely the question of damages and the evidence pertaining thereto.
In addition to renewing their charge that the jury's award of damages is against the weight of the evidence, plaintiffs contend that the trial judge committed prejudicial error in: *82 (1) excluding the testimony of their medical expert as to the alleged double vision of the plaintiff and the cause thereof, and charging the jury that all evidence relating to double vision should be disregarded; (2) barring, as an element of damages, proof of the alleged loss of a football scholarship by plaintiff due to the accident, and (3) preventing young Angel's family physician, a medical witness, from explaining certain of the hospital records admitted into evidence.
Plaintiffs produced, among other medical expert witnesses, Dr. Richard U. Stern, a physician specializing in ophthalmology, in an effort to demonstrate that Angel was suffering from double vision (diplopia), probably caused by the accident. The infant plaintiff had previously testified that he has been afflicted with blurred vision ever since the collision. Dr. Stern testified to a diplopic condition which manifested itself whenever young Angel gazed up and to the right. This was described by the physician as "left hypotropia," that is, "when the patient looks up and to his right, the left eye goes too high, because the right upper muscle is not strong enough, as a result of the injury."
Out of the presence of the jury the trial judge expressed reluctance at allowing the witness to link the diplopic condition to the plaintiff's head injury. This unwillingness was apparently based upon his assumption that sufficient evidence of brain damage had not been presented to justify the testimonial connection. Additional questioning of Dr. Stern elicited the opinion that his own examination, conducted about a month and a half prior to trial, indicated that Angel's visual condition was linked to damage in the area of the brain stem. Defense counsel then attempted to wrest from the witness concurrence in the original diagnosis of the treating surgeon at Presbyterian Hospital, that the patient had "no cranial nerve damage," but Dr. Stern did not agree:
"Q. So, as a result of examination and treatment, [if] you found there was no cranial nerve damage, what would that mean to you? A. The doctor didn't do a complete examination, because there *83 obviously is a definite imbalance of the eye muscles which involve the third nerve.

* * * * * * * *
Q. But the fact that there is no cranial nerve pathology means that there was no injury to the optic nerves or the nerves controlling the movement of the eye, is that right?

* * * * * * * *
A. An examination for intact cranial nerves or normal cranial nerves might not reveal, if done at the bedside, might not reveal the double vision up to the right. It might not.
Q. But the term `no cranial nerve damage' refers to the nerves controlling eyes, as well as other parts of the head, does it not? A. Yes, sir.

* * * * * * * *
Q. And if you were advised that the examining general surgeon who examined this boy found the cranial nerves intact, would that cause you to change your mind as to when that condition that you find two years afterward may have occurred?
A. No, sir. I think it is entirely possible that the weakness of the muscle which is now evident might not appear immediately, or it might appear immediately, and it might be missed in a gross neurological examination. Not by an ophthalmologist, certainly, but I certainly think it might be missed by a general surgeon."
At this juncture, the trial judge, still refusing to permit the jury to hear Dr. Stern's testimony, stated:
"* * * I am not a doctor and I do not know what is required to prove damage to the brain that may affect the nerves leading to the eye * * * but as the record now stands, there was no damage to the brain as a result of this accident."
There followed a long hypothetical question, the exclusion of which we consider to be the nub of this appeal. The question embodied the facts and circumstances of the accident, young Angel's own physical complaints, and the reported medical symptoms from the time of the accident to date, and requested Dr. Stern's opinion as to the competent producing cause of the diplopia. Objection to this query was sustained by the trial judge on the ground that no cranial pathology had been shown. The judge then reserved decision, pending the production of additional supportive evidence by plaintiffs, on a defense motion to strike all of Dr. Stern's testimony from the record.
*84 It is to be noted that plaintiffs later attempted to fill the supposed evidentiary gap with respect to brain damage by placing on the stand Dr. Eliott Rinzler, a specialist in neurosurgery, who had been called into consultation by the general surgeon at Presbyterian Hospital several hours after young Angel's admission. Dr. Rinzler said that it was he who had made the diagnosis of cerebral concussion and edema of the brain. He described edema as a swelling of the brain tissue due to the escape of fluid from the smaller blood vessels and capillaries into the tissues. He was asked whether edema is an injury to the brain, and responded, "surely," adding, in response to a further query as to the severity of the injury,
"* * * edema itself can range from minor to severe, and this can be told only by the clinical course of the patient. I should say that an edema which lasted as long as this boy's period of unconsciousness and drowsiness thereafter was at least moderate."
Dr. Rinzler admitted on cross-examination that his initial and supplementary examinations had not disclosed any cranial nerve damage, but refused to state flatly that no such damage existed. He went on to describe the swelling and congestive processes which follow edema of the brain and, when questioned as to whether blockage of the blood supply would have had any effect upon the cranial nerves in George Angel's case, answered in part,
"I am not myself an ophthalmologist and, therefore, I don't feel qualified to say what the condition of his nerves are to the eyes at the moment. However, pressure of any kind can affect the cranial nerves; yes." (Emphasis added)
At the conclusion of Dr. Rinzler's testimony the court granted defendants' motion and struck Dr. Stern's testimony on the ground that no evidence of cranial nerve damage had been produced. The judge's excision was reinforced by an instruction to the jury to "disregard the evidence regarding double vision because it is not connected up with the accident."
*85 The ability to render expert opinion is by definition beyond the experiential capacity of the ordinary layman. See 2 Wigmore, Evidence, § 556, p. 635. In fact, the primary justification for lifting the ban on the admission of opinion testimony, in the case of experts, is the relative helplessness of the average juror in dealing with a subject not of common knowledge; thus our cases speak of the "necessity" or "reasonable necessity" for expert opinion. Beck v. Monmouth Lumber Co., 137 N.J.L. 268, 277 (E. & A. 1948); Rempfer v. Deerfield Packing Corp., 4 N.J. 135, 141-142 (1950); Thompson v. Pennsylvania R.R. Co., 51 N.J.L. 42, 46 (Sup. Ct. 1888); Pincus v. Sublett, 26 N.J. Super. 188, 192 (App. Div. 1953), certification denied 13 N.J. 294 (1953); see 7 Wigmore, supra, § 1923, pp. 21-22.
To insure, however, that the flow to the jury of "expert" information is not wholly bogus in nature, there has developed the safeguard implicit in the preliminary process of "qualifying" the witness, the control of which is almost invariably left to the sound discretion of the trial judge. Cowdrick v. Pennsylvania R.R. Co., 132 N.J.L. 131, 141 (E. & A. 1944); Bosze v. Metropolitan Life Ins. Co., 1 N.J. 5, 10 (1948); Zampieri v. River Vale Tp., 29 N.J. 599, 611 (1959); see 2 Wigmore, supra, § 561, pp. 641-643. And as a further check on the funnelling of improper or legally irrevelant conclusions to the trier of fact, our law has fashioned the principle that the opinions of experts must be founded either upon facts within their own knowledge or, in the case of a hypothetical question, upon facts and inferences supportable by the proofs  i.e., evidence which there is a fair possibility the jury will accept. Beam v. Kent, 3 N.J. 210, 215 (1949); Stanley Co. of America v. Hercules Powder Co., 16 N.J. 295, 305-306 (1954); Fink v. City of Paterson, 44 N.J. Super. 129, 135 (App. Div. 1957); see 2 Wigmore, supra, § 682, p. 805.
Once these hurdles are overcome, the credibility of the expert and the weight to be accorded his testimony *86 rest in the domain of the trier of fact. 20 Am. Jur., Evidence, § 867, pp. 731-732; see Kreis v. Owens, 38 N.J. Super. 148 (App. Div. 1955). Unless contrary to common sense, common knowledge, or recognized physical laws, or based on primary facts absent from the proofs, the expert's statements are to be sifted by the jury like other testimony. See Annotation, 136 A.L.R. 965 (1942); 66 A.L.R.2d 1082 (1959); see 32 C.J.S. Evidence § 569a, p. 392. The testimonial and experiential weaknesses of the witness, such as (1) his status as a general practitioner, testifying as to a specialty, or (2) the fact that his conclusions are based largely on the subjective complaints of the patient or on a cursory examination, may be exposed by the usual methods of cross-examination. He may be required to detail the premises upon which his observations are based, 2 Wigmore, supra, § 672, pp. 792-793, and these premises, as well as his ultimate conclusions, may be contradicted by rebuttal experts and by other evidence of the opposing party. Panko v. Grimes, 40 N.J. Super. 588, 596 (App. Div. 1956); Kelly v. Martino, 375 Pa. 244, 99 A.2d 901, 902 (Sup. Ct. 1953).
We have provided this backdrop of orthodox expert witness procedure in order more strikingly to silhouette the improvident action of the trial judge in removing Dr. Stern's testimony from jury consideration. We note initially that the ophthalmologist's credentials as an expert on the causes and effects of eye injury were not seriously disputed, and thus the issue of competency is not before us. The apparent basis for the trial judge's exclusion was his determination that a showing of cranial nerve damage was a prerequisite to any proof of connection between the automobile accident and Angel's impairment of vision. This constituted an unwarranted attempt to interject his personal evaluation of the persuasiveness of the witness's reasoning as a barrier to jury consideration. The testimony of Dr. Stern, supplemented by that of Dr. Rinzler, presents the hypothesis that the escape of blood and blockage of the blood supply due *87 to edema of the brain eventually produced the muscle imbalance causing diplopia. It was stated unequivocally by both physicians that the failure to make clinical findings of cranial damage in no way precluded such a hypothesis.
The nature of the trial judge's arrogation of jury power is best illustrated in his refusal to permit a hypothetical question embracing exclusively facts supported by the evidence. These included the factual contentions that plaintiff was unconscious following the accident, was semi-conscious for a period of ten days, had two fractures of the skull, had a diagnosis of concussion and edema of the brain, and had begun, immediately after the accident, to experience a blurring of vision. The question sought an opinion as to cause and effect. Compliance by the questioner with all preconditions dictated that the question be admitted and that the answer be weighed, as usual, by the trier of fact. See 32 C.J.S. Evidence § 569d, pp. 398-399. It is not within the province of a trial judge, in a jury case, to determine on his own initiative that the inferential chain drawn by a qualified expert witness, in response to a properly posed hypothetical question, contains a medically dubious link.
Defendants' subsidiary assaults on Dr. Stern's testimony are without merit, and do not justify the trial court's exclusionary ruling. The physician's reference to hospital records of some ten years previous to the accident, in which young Angel was surgically cured of a cross-eyed condition, was not an affirmative basis for his opinion in the instant case, and he, as an examining physician, therefore did not rely upon the patient's history in forming his conclusion, in violation of the rule of Sandford v. Chanaz Co., 117 N.J.L. 485 (E. & A. 1937). His mention of the records was only for the purpose of negating the relevance of the prior operation to the present condition, in anticipation of an expected attack upon his conclusion on the basis of a prior report he had given referring to that operation. Absent all mention of the records or the history contained therein, his present conclusion would stand. Secondly, Dr. Stern's *88 statement on direct examination that the eye condition was merely "compatible" with the traumatic injuries was bolstered on cross and redirect examination; the ophthalmologist finally made it evident that in his opinion the eye condition resulted from the accident.
We conclude that the exclusion of Dr. Stern's testimony precluded the jury from considering a vital component of plaintiffs' alleged damages. In the light of all the evidence as to plaintiff's other injuries and the relatively low figure awarded by the jury therefor, it appears to us that the interests of substantial justice require that a new trial be held, to be limited solely to the issue of damages. R.R. 1:5-3(b). See Fisch v. Manger, 24 N.J. 66, 80 (1957).
In order to forestall renewed controversy on the retrial, we deem it expedient to discuss briefly the trial judge's other evidentiary rulings to which the plaintiffs take exception. Young Angel was, at the time of the accident, a student at Upsala College. He was the recipient of an athletic scholarship, which brought to him an annual stipend on the conditions that he play football and maintain a "C" average. He had maintained his eligibility for the scholarship during his first year at college and through the first semester of his sophomore year. Prior to the accident, he had lost the scholarship in the second semester of that year for failure to maintain a "C" average. The accident occurred during this semester, and, of course, prevented him from subsequently playing football. Plaintiffs point to the fact that young Angel maintained a "C" average following his return to school in the fall of 1958, and assert that the accident was the cause of his inability to play football and consequent loss of scholarship. We are of the opinion that the trial judge, to whom broad leeway is generally given in ruling on the cogency of evidence, did not abuse his discretion in charging the jury to disregard this claim on the ground that it was too remote and speculative. The uncertainty surrounding the question of whether the accident was the proximate cause of Angel's loss of scholarship, i.e., *89 whether he would have satisfied the academic conditions in light of his past failure, was sufficiently great to justify exclusion of this evidence under recognized standards of measuring tort damages. See Kurtz v. Oremland, 33 N.J. Super. 443, 453 (Ch. Div. 1954); Restatement, Torts, § 912, especially illustration 10; 25 C.J.S. Damages § 27, p. 493.
With respect to the trial judge's action in sustaining defendants' objection to elicitation of testimony from Dr. Tauber as to the results of young Angel's urine tests, no error was committed. The proffered testimony was merely repetitious of the hospital records, already in evidence, and judicial discretion was in no way abused.
In view of our conclusion that there should be a new trial as to damages, we do not determine plaintiffs' contention that the verdict was inadequate apart from the effect of the exclusion of Dr. Stern's testimony.
The judgment of the Law Division is reversed and a new trial is ordered on the issue of the quantum of plaintiffs' damages.