# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5034-17T5

IN THE MATTER OF THE CIVIL
COMMITMENT OF A.B.,
SVP-603-11.

_____

Argued May 14, 2019 – Decided May 24, 2019

Before Judges Fisher, Hoffman and Suter.

On appeal from Superior Court of New Jersey, Law Division, Essex County, Docket No. SVP-603-11.

Patrick Madden, Assistant Deputy Public Defender, argued the cause for appellant A.B. (Joseph E. Krakora, Public Defender, attorney).

Francis X. Baker, Deputy Attorney General, argued the cause for respondent State of New Jersey (Gurbir S. Grewal, Attorney General, attorney).

PER CURIAM

A.B. appeals from a judgment entered on June 25, 2018, that continued his commitment to the Special Treatment Unit (STU) after a review hearing held pursuant to the Sexually Violent Predator Act (SVPA), N.J.S.A. 30:4-27.24 to -27.38. We affirm.

In 1989, when appellant was seventeen, he raped a sixty-four-year-old woman at knife point because he had a "problem" with her grandson. He pleaded guilty to aggravated sexual assault with a weapon, making a terroristic threat, unlawful possession of a weapon, and possession of a weapon for an unlawful purpose. He was sentenced to fifteen years in prison with five years of parole ineligibility.

When appellant was released, he did not comply with requirements to register as a sex offender, or otherwise comply with the community supervision for life requirements under Megan's Law.[1] Within five months of his release, appellant sexually assaulted a five-year-old female in a school where he was working as a volunteer. While released on bail for that offense, he allegedly raped a seventy-five-year-old woman in her motel room, threatening to kill her if she made a sound. She died of unrelated causes before trial, and those criminal charges were dismissed.

He was convicted at trial of the offenses involving the child, which included second-degree kidnapping, third-degree aggravated criminal sexual contact and third-degree endangering the welfare of a child. He pleaded guilty to failing to register as a sex offender or to give notice of his change in address.

---

[1] N.J.S.A. 2C:7-1 to -23.

A-5034-17T5

Appellant was sentenced to fifteen years in prison with ten years of parole ineligibility.

While incarcerated, he committed disciplinary infractions, some of which included sexual acts, unauthorized contacts and threats. He received eight modified placements while in STU. The most recent, in April 2017, involved an alleged statement by appellant that he "knew the address of a female staff member, which was interpreted as a veiled threat against a staff member who had previously redirected him." Appellant denied making this statement. He also was observed "dropping contraband out of the port in his cell door" that may have been drugs.

We affirmed his 2011 civil commitment under the SVPA.[2] Subsequent review hearings have continued his commitment to STU. Appellant appeals the June 25, 2018 judgment entered after the June 1, 2018 review hearing.

Involuntary civil commitment under the SVPA can follow completion of a custodial sentence when the offender "suffers from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for control, care and treatment."

---

[2] IMO Civil Commitment of A.B., SVP-603-11, A-4488-10 (App. Div. November 21, 2014).

N.J.S.A. 30:4-27.26.  The SVPA defines "mental abnormality" as "a mental condition that affects a person's emotional, cognitive or volitional capacity in a manner that predisposes that person to commit acts of sexual violence."  Ibid. The mental abnormality or personality disorder "must affect an individual's ability to control his or her sexually harmful conduct."  IMO Commitment of W.Z., 173 N.J. 109, 127 (2002).

At an SVPA commitment hearing, the State has the burden of proving the offender poses a threat "to the health and safety of others because of the likelihood of his or her engaging in sexually violent acts."  Id. at 132.  "[T]he State must prove that threat by demonstrating that the individual has serious difficulty in controlling sexually harmful behavior such that it is highly likely that he or she will not control his or her sexually violent behavior and will reoffend."  Ibid.

To commit or continue the commitment of the individual to the STU, the State must establish by clear and convincing evidence that it is highly likely the individual will sexually reoffend within the reasonably foreseeable future.  Id. at 130-32; see also IMO Civil Commitment of R.F., 217 N.J. 152, 173 (2014). Because commitment under the SVPA is based on "present serious difficulty with control over dangerous sexual behavior, . . . [the] annual court review

4

hearings on the need for continued involuntary commitment" require an assessment of "fresh information concerning the committee's dangerousness." W.Z., 173 N.J. at 132-33.

At the June 2018 review hearing, Dr. Marta Scott, a psychiatrist, testified that in the past, appellant "denied almost everything" or would "minimize," which was "a manifestation of his antisocial disorder."  During the seven years in STU, appellant made "slight progress," which meant there was "some reduction in his risk," but he had not "internalized" the treatment.  She testified appellant "demonstrate[d] a longstanding pattern of . . . maladaptive behaviors" and would not be able to comply with conditions if released.

Dr. Scott diagnosed appellant with "Other Specified Paraphilic Disorder, (nonconsent type)," meaning that he "experiences recurrent and intense fantasies, urges, and/or behavior involving sexual arousal to forced sexual behavior."  She diagnosed him with "Antisocial Personality Disorder," which refers to his "failure to conform to social norms with respect to lawful behaviors by repeatedly performing acts that are grounds for arrest . . . ."  For appellant, the antisocial personality "manifests itself sexually."  The combination of the two diagnoses predisposes appellant to "committing a sexually violent act as defined by [the SVPA]."  This "increases the risk of recidivism."

5

Dr. Scott scored appellant with a seven on the Static-99R test,[3] which placed him at a risk level "well above average risk range." She recognized that over the past year, appellant was on a "more positive trajectory," but his understanding of sex offender treatment remained "elementary"; he had not learned the "tools necessary to help him stop himself from acting upon . . . impulses" and his antisocial behavior "was still there."

Dr. Scott's opinion was that appellant "continues to suffer from a mental abnormality that affects his cognitive, emotional and volitional capacity in a manner that results in serious difficulty with controlling his sexually dangerous behavior and predisposes him to commit future acts of sexual violence." She considered appellant "to be at high risk to reoffend if not confined to a secure treatment facility such as the STU."

Dr. Laura Carmignani, a psychologist, testified that appellant had made some improvement in the past year, but remained in the "elementary" stage of understanding release prevention strategies. The STU treatment review report stated that appellant had "significant difficulty with the relapse prevention . . .

---

[3] "The Static-99 is an actuarial test used to estimate the probability of sexually violent recidivism in adult males previously convicted of sexually violent offenses." R.F., 217 N.J. at 164 n.9 (citing Andrew Harris et. al., Static-99 Coding Rules Revised-2003 5 (2003)).

modules."  Given his diagnoses of paraphilic disorder (nonconsent type) and antisocial personality disorder, Dr. Carmignani testified that appellant had the "potential to act aggressively but through sexual means," and that he remained at high risk to reoffend.

His PCL-R score,[4] was high, showing appellant met "the clinical threshold for psychopathy."  If released, Dr. Carmignani testified appellant would not likely comply with the conditions of his release.  The report stated that appellant had "yet to significantly lower his risk of recidivism" and that he "remains highly likely to engage in acts of sexual violence if not confined to the STU."

Dr. Christopher Lorah, a psychologist testifying for appellant, stated that his "risk in the community could be managed successfully with a conditional discharge."  Dr. Lorah based this opinion on appellant's "behavior stability" for the past year.  He recommended the immediate commencement of discharge planning for the next year.  During that time, appellant should be given furloughs and there should be polygraphs to evaluate his behavior.  Appellant's conditions of release should include mandatory sex offender treatment, polygraph examinations, random urinalysis, GPS monitoring, parole home visits and no

---

[4]  PCL-R stands for the Psychopathy Checklist-Revised Test, which measures an individual's psychopathy and helps predict future violence.  See Trantino v. N.J. State Parole Bd., 166 N.J. 113, 162 (2001).

contact with underage children. His internet and phone should be monitored. Appellant's 2017 modified placement, where he allegedly obtained the address of a female staff member, did not change Dr. Lorah's opinion because, in his view, this did not affect his potential for sexual recidivism. Dr. Lorah acknowledged that appellant was not appropriate for immediate community discharge because he "would need to see . . . the furlough process and some change." Dr. Lorah testified that appellant understood relapse prevention techniques. He said there was an "absolute possibility that [appellant] could sexually reoffend" if he became angry, but he believed that appellant had gained the knowledge and the experience necessary to control these urges.

The court found no dispute that appellant "suffers from a mental abnormality and a personality disorder," and that these individually and in combination "predispose[] him to engage in acts of sexual violence . . . ." However, the court rejected as premature the recommendation by Dr. Lorah that appellant was capable of a conditional discharge with a one-year set of furloughs. In the court's view, Dr. Lorah "placed too much emphasis on [appellant's] progress" and "maybe stretched his position." The court found the record supported the State's experts and he credited their opinions that, although appellant was making progress, he still posed a high risk of reoffending and

should remain committed. The court concluded it would be premature to release appellant, and could not find that he would comply with conditions if released on conditional discharge. The court found that appellant "would have serious difficulty controlling his sexually violent behavior and would be highly likely within the reasonably foreseeable future . . . to engage in acts of . . . sexual violence." Balancing what appellant "tends to do" against "his propensity for doing it, [he is] clearly still a dangerous person."

On appeal, appellant contends that the court erred by continuing his commitment to STU under the SVPA, because he alleges he is not highly likely to reoffend.

Our scope of review of judgments in SVPA commitment cases is "extremely narrow." R.F., 217 N.J. at 174 (quoting In re D.C., 146 N.J. 31, 58 (1996)). "The judges who hear SVPA cases generally are 'specialists' and 'their expertise in the subject' is entitled to 'special deference.'" Ibid. (quoting In re Civil Commitment of T.J.N., 390 N.J. Super. 218, 226 (App. Div. 2007)). "We give deference to the findings of our trial judges because they have the 'opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.'" Ibid. (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). "Accordingly, an appellate court should not modify a trial

9

court's determination either to commit or release an individual unless 'the record reveals a clear mistake.'" Id. at 175 (quoting D.C., 146 N.J. at 58). "So long as the trial court's findings are supported by 'sufficient credible evidence present in the record,' those findings should not be disturbed." Ibid. (quoting Johnson, 42 N.J. at 162); see also In re Civil Commitment of J.M.B., 197 N.J. 563, 597 (2009).

There was ample evidence to support the court's finding that it was premature to release appellant because he was a sexually violent predator within the SVPA, who remains highly likely to reoffend unless he is civilly committed to STU. All the experts diagnosed appellant with specified paraphilic disorder, (nonconsent type), and an antisocial personality disorder. Drs. Scott and Carmignani testified these disorders predisposed appellant to an "increase[d] risk of recidivism." Dr. Lorah agreed that with these combined diagnoses "people in the community fail more quickly." He did not favor immediate release; Dr. Lorah testified that he needed to see what happened with appellant during furloughs. He testified he wanted to see "some change," but he did not say what needed to be changed.

There was testimony that in the eight years appellant was at STU, he required multiple modified placements. The most recent one in 2017 involved

an allegation that appellant obtained the address of a female member of the staff who had redirected him. This was interpreted as a threat. Appellant had achieved only an elementary level of knowledge about relapse prevention and remained at high risk of reoffending, according to the State's experts. The court was permitted to credit the opinions of the State's experts, who unequivocally opined that appellant was highly likely to reoffend, and not appellant's expert, who the judge viewed as having "stretched" his opinion about release. See Angel v. Rand Express Lines, Inc., 66 N.J. Super. 77, 85-86 (App. Div. 1961) (recognizing the fact-finder's prerogative to accept the opinions of certain testifying experts and to reject competing opinions of an opposing expert). Accordingly, there is no basis for reversal on this record.

     Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION