**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3571-19

DAVID JONES,

     Petitioner-Appellant,

v.

BOARD OF TRUSTEES,
PUBLIC EMPLOYEES'
RETIREMENT SYSTEM,

     Respondent-Respondent.

_____

Argued November 1, 2021 – Decided August 10, 2022

Before Judges Accurso and Rose.

On appeal from the Board of Trustees of the Public Employees' Retirement System, Department of the Treasury, PERS No. xx6732.

Samuel M. Gaylord argued the cause for appellant (Gaylord Popp, LLC, attorneys; Samuel M. Gaylord, on the brief).

Matthew Melton, Deputy Attorney General, argued the cause for respondent (Andrew J. Bruck, Acting Attorney General, attorney; Melissa H. Raksa,

Assistant Attorney General, of counsel; Matthew
Melton, on the brief).

PER CURIAM

David Jones appeals from a final decision of the Board of Trustees of the Public Employees' Retirement System, denying his application for accidental disability retirement benefits. The Board rejected the findings of an Administrative Law Judge who determined Jones is totally and permanently disabled as a direct result of a puncture wound to his right hand suffered in a fall at work. Because we agree with the Board that Jones failed to establish his disabling condition was a direct result of the work injury to his hand, we affirm.

The facts surrounding the accident are not in dispute. Jones worked as a recycling operator for Ocean County, grinding up brush and trees, mulching leaves and collecting materials from different sites. He'd worked for the County for two years at the time of his accident. In 2010 Jones was connecting an industrial tub grinder to a truck when he slipped and fell, piercing the palm of his right hand on a bungee cord hook. He was transported by ambulance and treated at an urgent care center.

The dispute in this case centered around the symptoms Jones reported and their connection to the fall. Jones complained to an orthopedic surgeon

within days of the accident of numbness and pain in his thumb and index finger. When an MRI reflected no evidence of a tendon tear, the doctor recommended exploratory surgery, which was performed a week after the accident. The surgeon reported Jones' nerves and tendons were intact, and in the weeks that followed, he improved and gained motion. Exercising his hand at home a month or so after the fall, Jones reported feeling a tearing sensation in his palm, after which he was unable to bend his fingers. He claimed to have had a similar response when a physical therapist later manipulated his thumb, sending pain shooting up into his neck.

Shortly thereafter, Jones reported he was unable to bend his hand at all, being unable to straighten his fingers or make a fist. He also complained about pain in his back and shoulder, problems flexing his elbow and severely limited range of motion. Five months after his fall, Jones was reporting difficulty moving his right arm. He reported numbness in his face and inside his mouth and drooling. He also reported difficulty with bladder control, gaining an erection and numbness in his feet.

A-3571-19

Although Jones returned to work for a short time on light duty, he claimed he was in too much pain to continue. He resigned from his job[1] and began treating with his own doctors after failing to obtain relief from the treatment provided by the County's workers' compensation doctor.

The Board denied Jones' application for accidental disability retirement benefits finding he was not totally and permanently disabled, and there was no evidence in the record that the fall and puncture wound to his hand were a direct cause of his symptoms. Jones appealed and the matter was transferred to the Office of Administrative Law for a hearing.

Jones testified about the accident and his hand, shoulder and back pain. Medical records admitted in evidence reveal Jones did not report pain in his neck or right shoulder until about a month after the accident. A progress note from that time by the orthopedist who performed the exploratory surgical procedure on Jones' hand, documents Jones' speculation "that he might not have been able to feel this initially because of the severe pain he had in the level of the hand." The note also states Jones "has not had pain in the level of the shoulder or the right side of the neck previously." The note concludes with

---

[1] The County claimed Jones had abandoned his job and instituted disciplinary action against him. Jones eventually settled his dispute with the County and was permitted to resign in good standing.

the surgeon determining to seek a neurology evaluation because Jones' report of pain in his shoulder and neck as well as his elbow and hand "does not fit in any specific orthopedic picture." The note repeats that the surgeon "visualized that the tendon and nerve structures in the area [of the puncture wound] were intact" during the exploratory procedure and reports the "incision is healing nicely."

Jones testified he "sustained a lot of injuries [in the accident] that were never looked at, and those injuries have gotten worse over time." He claimed he was in pain "24 hours a day, 7 days a week," although taking no pain medication and receiving no treatment. Jones testified, consistent with the medical records in evidence, that it was after the exploratory surgery but before he started physical therapy when he was doing range of motion exercises at home that he experienced the "sharp pain" and "all fingers stopped moving." He also testified that "[f]or the first month or so, it seemed like things were progressing well." But then "[o]ne day something went terribly wrong at physical therapy." Jones claimed the therapist "moved my thumb out, and it shot a pain up into my neck and, then, that was it" his fingers "never moved after that."

A-3571-19

According to Jones, after the problem with the pain radiating from his thumb up into his neck, doctors undertook a "nerve conductive study," and finding "problems," doctors "were on the defensive. They were worried because things were bad. At that point, they never looked any further than my neck. They never looked down my back." Jones claimed "after that, every doctor they sent me to was trying to say there was nothing wrong. They were just ignoring the problems."

Jones did not present the testimony of a treating doctor. Instead, each side presented the testimony of an expert who examined Jones for purposes of this action. In her decision, the ALJ very briefly summarized the testimony of both experts.

The ALJ noted Jones' expert, a board certified orthopedist, who had not performed surgery since the early 1990s, diagnosed him with "chronic post-traumatic cervical and lumbosacral strain and sprain; bulging discs C4-C5, C5-C6 and C6-C7; aggravation of pre-existing age-related multi-level degenerative disc disease; cervical radiculopathy, herniated nucleus pulposus L4-L5 and L5-L6 and herniated discs at T1-T2 and T8-T9; [and] continuing neuropathic pain syndrome in the right hand." The ALJ recapped the expert's testimony that exploratory surgery of Jones' hand was conducted "[a]fter the

6

hand failed to heal," and that despite "epidural injections" four years after the accident that brought "minor relief . . . [t]he hand never fully healed."[2] She concluded Jones' expert testified he "was working without any pain prior to the accident," and in the expert's medical opinion, Jones "is totally and permanently disabled as a result of his neck, back and hand injuries" as a "direct result" of his fall at work.

The ALJ noted the Board's expert, a board certified orthopedic surgeon who currently performs surgery in his practice, reviewed MRI, x-ray reports and "other records from [Jones'] treating physicians." The expert claimed Jones did not report any complaints in his back and neck during the expert's examination of him more than four years after the accident. The expert examined Jones' hand, noting its "clenched" state and decreased sensation, but claimed "he could not explain the condition of [Jones'] hand and opined that it was inconsistent with the injury." He also noted the disc bulges and herniations reflected in the reports as well as Jones' bilateral footdrop but did not find any evidence of the footdrop or any other disability. The ALJ summarized the Board's expert's conclusions by writing "[i]n short,

_____

[2] It appears from the record that Jones received only one epidural injection and no other treatment besides some occupational therapy for his hand in 2010 or 2011.

A-3571-19

notwithstanding the reports from various treating physicians for several years, MRIs and x-rays to the contrary, [the Board's expert] found no evidence of any disability in the neck, back or hand," and concluded "in his expert medical opinion" Jones was "not totally and permanently disabled from his position at the Ocean County Recycling Center."

Weighing the conflicting opinions, the ALJ found Jones' expert "offered clear, concise and detailed testimony and demonstrated knowledge of [Jones'] symptoms, x-rays, MRIs and past medical history," while the Board's expert, although having "claimed to have reviewed prior medical reports and conducted a physical examination of [Jones], . . .gave no weight to [Jones'] symptoms, the MRI and x-rays and other medical reports." The ALJ thus concluded it was "difficult to give any weight" to his opinion. She was "[o]n balance, . . . persuaded by, and [gave] greater weight to, the testimony of [Jones' expert], specifically crediting his detailed tying of [Jones'] conditions, treatments, and [his] medical history," including "his conclusion that [Jones'] disability is total and permanent, and a direct result of the July 2010 accident."

The Board rejected the ALJ's decision and, specifically, her findings as to the credibility of the experts who testified at the hearing. The Board found the ALJ misstated the testimony, noting she "incorrectly found" the Board's

8

expert failed to examine Jones' neck and back, notwithstanding his unequivocal testimony to the contrary, including his report of a negative finding on the Spurling test. The Board found the ALJ's summary of the expert's "testimony to be simply incorrect," providing no support for her determination that the Board's "expert testimony and opinion were not credible."

The Board also rejected as unsupported the ALJ's finding that the Board's expert "gave no weight to [Jones'] symptoms, the MRI and x-rays and other medical reports." Specifically citing to the record, the Board found the expert "was ultimately unable to correlate Jones' subjective and self-reported symptoms with the objective diagnostic medical evidence such as MRIs and x-rays, to which he did give appropriate weight." The Board noted the expert "used his medical knowledge to compare the subjective with the objective, reaching a medical conclusion that was more supported by the available objective evidence than Jones' expert," who the Board found "theorized about facts outside of the record in trying to tie the alleged condition of Jones' hand with the available medical documentation." The Board found the ALJ "failed to properly distinguish between . . . Jones' subjective complaints versus complaints that were corroborated by objective medical findings."

9

The Board noted other errors in the ALJ's summary of the testimony, including that Jones reported symptoms to his neck and back at the same time he reported the injury to his hand, although Jones conceded at the hearing those other symptoms appeared weeks after the fall. The Board found "[t]hese differences from the actual record are not trivial," because "[u]nder the ALJ's misreading, there were demonstrable injuries, signs of injury, and contemporaneous subjective reports that manifested at the time of the 2010 incident, as opposed to the still unexplained set of symptoms claimed later by Jones and unsupported by corroborating objective evidence." The Board found "[t]he implication that Jones was not fully treated initially or fully evaluated by [the Board's expert] on the basis of symptoms that were not presented at the time is a fatally flawed foundation of the ALJ's credibility findings," leading to the Board's rejection of the ALJ's findings on the point.

The Board found that in rejecting its expert's "opinion and testimony, the ALJ effectively found a medically impossible symptomology credible." The Board noted its expert "testified in detail that a complete paralysis of the hand and wrist is simply not consistent with the fact that the relevant nerves that could be affected by a puncture would innervate or enervate only particular parts of the hand rather than the entirety of it." The Board further observed

10

that "Jones' claims of limited wrist motion were also inexplicable given the location and responsibilities of the nerves that would be implicated in his hand's total failure to function at all compared with the puncture in his palm that is supposedly the root of their damage."

The Board focused on its expert's testimony that when he "put Jones' wrist in flexion to test the state of his tendons," which he demonstrated at the hearing, "Jones' fingers did not move, indicating either that his tendons had been severed (which is indisputably not the case) or that Jones was purposefully not letting his fingers move in response to the test." The expert testified to account for that response, "he'd have to have a cut of every single tendon and every nerve across the wrist and also, he'd have to have a cut nerve up from a higher level for wrist extension and flexion." The expert also opined "Jones' hand symptoms could not be explained by a herniated disc or spine pathology," an opinion the ALJ failed to address. The Board concluded the ALJ's "[d]ecision disregarded wholesale the fact that Jones' symptoms strain credulity and there is a far more plausible reason why Jones is not making use of his allegedly paralyzed hand, which both experts stated shows no signs of atrophy."

A-3571-19

Even more important, however, the Board noted "[t]he ALJ also erroneously stated [Jones' expert] came to the conclusion that the disability was a direct result of the 2010 incident," although he never made a "claim of direct causation" and the decision nowhere cites to one. The Board noted Jones' expert "testified — based on nothing in the record or his report — that infection and inflammation in Jones' hand have spread and 'that's why he's developed this claw like deformity, because he's getting adhesions in the hands now. That's why the hand looks like it does on the right side.'"[3] The Board found Jones' expert "admittedly based this opinion on the mere fact that there was exploratory surgery following a hand puncture," but "he never reviewed the notes of the operation to confirm this theory and instead relied on broad

---

[3] Jones' expert further testified "one of the problems when you get a penetrating hand wound, is that infection and inflammation can spread through the fascial plates. That's why hand wounds are so difficult to deal with. And that's why he did have surgery to try and get this thing under control early on." The expert added, "[u]nfortunately for Mr. Jones, it didn't. And that's why he's developed this claw like deformity, because he's getting adhesions in the hands now, in the tendons that pull the fingers." According to the medical records in evidence, the exploratory surgery performed a week after the accident was done to allow the surgeon to visualize the nerves and tendons in the hand based on Jones' complaint of numbness and pain in his thumb and forefinger, not to "clean it up because it's a penetrating wound," as Jones' expert testified without having reviewed the operative notes. The surgeon found no injury to those structures and reported the "incision is healing nicely."

A-3571-19

inference to find an infection in Jones' hand ultimately responsible for the unexplained symptoms."

The Board rejected Jones' expert's attempt to tangentially link Jones' claimed hand paralysis "to the 2010 incident by way of an imagined infection" never noticed or documented by any of the several doctors and physical therapists who treated Jones in the years following his fall. The Board rejected the ALJ's reliance on the testimony of Jones' expert because "it was not based on the record, but on speculation."

The Board accordingly concluded Jones failed to produce competent medical testimony that his claimed disability is the direct result of a traumatic event. See Korelnia v. Bd. of Trs., 83 N.J. 163, 170 (1980) (explaining a traumatic event, "while it need not be the sole or exclusive causative agent, must at the very least be the essential significant or the substantial contributing cause of the disability"). It noted "[t]he tenuous connection between Jones' symptoms and his medical reports carries through to the even more tenuous connection between his symptoms and the incident in question as the puncture wound from the bungee cord would have been incapable of producing a total paralysis of Jones' right hand."

The Board explained "[t]he events presented by Jones to explain his hand paralysis cannot, in themselves, produce a legally adequate showing of direct causation as they rely on proximate cause." As both Jones testified and the progress notes of the orthopedic surgeon who performed the exploratory procedure verified, his "puzzling hand symptoms" began after a physical therapist manipulated his thumb weeks after his fall and the exploratory procedure. The Board concluded that "[e]ven if it were possible that the overextension of a thumb could serve to make the severing of all the controlling nerves and tendons that were shortly before all found to be intact, this event was not part of the 2010 incident and does not present a direct causation."

Jones appeals, arguing the Board "improperly determined" he failed to prove he is totally and permanently disabled and that his 2010 fall "was the substantial cause" of his disability. We disagree.

Our role in reviewing the decision of an administrative agency is limited. In re Stallworth, 208 N.J. 182, 194 (2011). We accord a strong presumption of reasonableness to an agency's exercise of its statutorily delegated responsibility, City of Newark v. Nat. Res. Council in Dep't of Env't. Prot., 82 N.J. 530, 539 (1980), and defer to its fact finding, Utley v. Bd. of Rev., 194

14

N.J. 534, 551 (2008); Mazza v. Bd. of Trs., Police & Firemen's Ret. Sys., 143 N.J. 22, 29 (1995) (Handler, J., dissenting).  We will not upset the determination of an administrative agency absent a showing that it was arbitrary, capricious, or unreasonable; that it lacked fair support in the evidence; or that it violated legislative policies.  Lavezzi v. State, 219 N.J. 163, 171 (2014); Campbell v. Dep't of Civ. Serv., 39 N.J. 556, 562 (1963).

Our public pension systems are "bound up in the public interest and provide public employees significant rights which are deserving of conscientious protection."  Zigmont v. Bd. of Trs., Tchrs.' Pension & Annuity Fund, 91 N.J. 580, 583 (1983).  Because pension statutes are remedial in character, they are liberally construed and administered in favor of the persons intended to be benefited thereby.  Klumb v. Bd. of Educ. of Manalapan-Englishtown Reg'l High Sch. Dist., 199 N.J. 14, 34 (2009).  Nevertheless, an employee has only the rights and benefits provided by those statutes and their enabling regulations.  Francois v. Bd. of Trs., Pub. Emps.' Ret. Sys., 415 N.J. Super. 335, 349 (2010).  The Board acts in a fiduciary capacity with the obligation to serve the best interests of the pension fund and all of its beneficiaries, not just the member seeking the benefit.  Mount v. Trs. of the Pub. Emps.' Ret. Sys., 133 N.J. Super. 72, 86 (App. Div. 1975).

15

Applying those standards here, we are satisfied the Board appropriately rejected the ALJ's initial decision finding Jones established he was permanently and totally disabled as a direct result of the work injury to his hand. See Richardson v. Bd. of Trs., 192 N.J. 189, 212 (2007) (defining a traumatic event as "an unexpected external happening that directly causes injury"). Although N.J.S.A. 52:14B-10(c) provides an agency head may not reject an ALJ's fact findings as to issues of credibility of lay witness testimony without first determining the findings are arbitrary or capricious or are not "supported by sufficient, competent, and credible evidence in the record," which the Board demonstrated here, the constraint does not extend to the testimony of experts in any event. See ZRB, LLC v. N.J. Dep't of Env't. Prot., Land Use Regul., 403 N.J. Super. 531, 561 (App. Div. 2008).

Cases involving disputes over accidental disability benefits are often awash in "conflicting medical opinion, most if it offered in good faith and always with the assurance that each is the medically accepted one." Bialko v. H. Baker Milk Co., 38 N.J. Super. 169, 171 (App. Div. 1955). It is incumbent on the ALJ in the first instance to appraise the "maze of conflicting medical proof," ibid., determining which opinion is the soundest depending on a variety of factors, including whether the experts have based their conclusions

16

largely on the patient's subjective complaints, and if their opinions are supported by objective evidence corroborated by other doctors, see Angel v. Rand Express Lines, Inc., 66 N.J. Super. 77, 86 (App. Div. 1961).

"Unless contrary to common sense, common knowledge, or recognized physical laws, or based on primary facts absent from the proofs, the expert's statements are to be sifted by the [factfinder] like other testimony."  Ibid.  Of course, "the value or weight of the expert opinion is dependent upon, and no stronger than, the facts upon which it is based."  State v. Vandeweaghe, 351 N.J. Super. 467, 480 (App. Div. 2002).  Ultimately, "the choice of accepting or rejecting testimony from witnesses resides with the administrative agency, and so long as that choice is reasonably made it is accorded deference on appeal."  In re Young, 202 N.J. 50, 70-71 (2010) (quoting Campbell v. N.J. Racing Comm'n, 169 N.J. 579, 587-88 (2001)).

Having reviewed the record, we are satisfied the Board's criticisms of the ALJ's fact-finding here are fair ones.  The ALJ's summary of the experts' testimony is cursory and does not capture the facts underlying the opinions of either expert.  See State, Dep't of Health v. Tegnazian, 194 N.J. Super. 435, 442-43 (App. Div. 1984) (discussing the need for the ALJ to make "basic findings of fact sufficient to support" the ALJ's recommendations).  The ALJ

17

relied on Jones' expert having diagnosed him as suffering from "chronic post-traumatic cervical and lumbosacral strain and sprain; bulging discs C4-C5, C5-C6 and C6-C7; aggravation of pre-existing age-related multi-level degenerative disc disease; cervical radiculopathy, herniated nucleus pulposus L4-L5 and L5-L6 and herniated discs at T1-T2 and T8-T9; [and] continuing neuropathic pain syndrome in the right hand," ignoring, as the Board's expert charged, that the "diagnosis" is merely a list of MRI findings and an undefined pain syndrome without any clinical correlation.[4]  Moreover, the ALJ did not address why she rejected the Board's expert's opinion that a puncture wound that demonstrably didn't damage the nerves and tendons in Jones' palm could not have caused his paralysis or accepted that of Jones' expert that the paralysis was caused by an infection nowhere documented in the medical record, i.e., an opinion based on facts not in the record.

---

[4]  Jones' expert did not define "neuropathic pain syndrome."  He testified Jones didn't have "a median nerve issue" and "you would be hard put to say that this gentleman had sustained a complex regional pain syndrome . . . to the right upper extremity," because "he's got none of the clinical findings to support Complex Regional Pain Syndrome."  The expert explained he wouldn't "call this CRPS disease because he doesn't match up with the criteria that's necessary.  So, it is what we would call neuropathic pain."  The Board's expert testified he'd never heard of it, and one would have to ask Jones' expert what he meant by it.

Most important, as the Board noted in its final decision, the ALJ erroneously stated Jones' expert concluded Jones' disability was a direct result of the 2010 incident, when he never offered that opinion at the hearing. While arguing the Board erred in rejecting the ALJ's findings, Jones, tellingly, does not point us to where his expert testified his paralysis was a direct result of his 2010 fall and puncture wound. We found no such testimony in the record. Although the expert testified Jones could no longer perform the functions of his job because he could not use his dominant hand, the expert did not opine Jones couldn't use that hand as a direct result of having impaled it on the bungee cord hook. Because Jones did not establish his alleged disability was as a direct result of his 2010 accident, the Board was correct to deny him accidental disability retirement benefits.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3571-19